Anthony W. Merrill (#022598)
Robert F. Kethcart (#023939)
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
E-Mail: amerrill@swlaw.com
rkethcart@swlaw.com
*Attorneys for Plaintiffs*

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Discovery Land Company, LLC; Discovery Land Enterprises, LLC and Taymouth Castle DLC, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>Berkley Insurance Company and Great American Insurance Company,<br><br>Defendants. | No. 2:20-cv-01541-PHX-JJT<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT** |

For their First Amended Complaint for declaratory relief, breach of contract, and violation of the duty of good faith and fair dealing against defendants Berkley Insurance Company ("Berkley") and Great American Insurance Company ("Great American") (collectively "Defendants"), plaintiffs Discovery Land Company, LLC, Discovery Land Enterprises, LLC, and Taymouth Castle DLC, LLC (collectively "Plaintiffs") allege as follows:

<u>Introduction</u>

1. This action arises from Defendants' wrongful refusal to indemnify Plaintiffs for insured losses resulting from two separate occurrences covered under primary Commercial Crime Policies issued by Berkley and follow-form excess policies issued by Great American.

2. Plaintiffs timely and properly submitted two separate Proofs of Loss under these insurance policies.

3. The first Proof of Loss relates to coverage for loss that Plaintiffs sustained resulting from Steven David Jones's ("Jones") theft of money entrusted to Jirehouse for the purchase of Taymouth Castle located in Perthshire, Scotland (hereinafter the "First Loss").

4. The second Proof of Loss relates to coverage for loss that Plaintiffs sustained resulting from an unauthorized loan taken out against Taymouth Castle as a result of the fraudulent execution of a loan application utilizing the forged signature of Plaintiffs' ultimate beneficial owner (hereinafter the "Second Loss").

5. Defendants breached the insurance policies by failing and refusing to pay Plaintiffs' covered losses under the policies.

6. Berkley breached its obligations of good faith and fair dealing, including, but not limited to, by failing to timely acknowledge Plaintiffs' claims, failing to properly investigate Plaintiffs' claims, ignoring evidence of coverage and seeking evidence to find against coverage, and failing to timely provide Plaintiffs its coverage position.

7. In this action, Plaintiffs request the Court resolve these disputes and award Plaintiffs the insurance coverage and protection that Plaintiffs purchased and that Defendants promised to provide.

<u>The Parties</u>

8. Discovery Land Company, LLC ("DLC") is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona.

9. Discovery Land Enterprises, LLC, f/k/a Discovery Land Holdings, LLC ("DLE") is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

10. Taymouth Castle DLC, LLC ("TCD") is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona.

11. Berkley is a Delaware corporation with its principal place of business in Connecticut. Berkley is an insurance company authorized to sell and issue insurance policies in the State of Arizona.

12. Great American is an Ohio corporation with its principal place of business in Ohio. Great American is an insurance company authorized to sell and issue insurance policies in the State of Arizona.

**Jurisdiction and Venue**

13. This lawsuit arises out of insurance contracts negotiated, entered into, and issued in the State of Arizona. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

15. This Court has personal jurisdiction over the Defendants.

**The Insurance Policies**

16. Berkley issued Policy No. BCCR-45002757-20 to Plaintiffs for the "policy period" of January 28, 2018 through January 28, 2019 (the "2018–2019 Primary Policy"). A copy of the 2018–2019 Primary Policy is attached as Exhibit A.

17. Berkley issued Policy No. BCCR-45002757-21 to Plaintiffs for the "policy period" of January 28, 2019 through January 28, 2020 (the "2019–2020 Primary Policy") (the 2018–2019 Primary Policy and the 2019–2020 Primary

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Policy are collectively referred to as the "Primary Policies"). A copy of the 2019–2020 Primary Policy is attached as **Exhibit B**.

18. Great American issued Excess Policy No. XSC E315871 00 00 to Plaintiffs for the "policy period" of January 28, 2018 through January 28, 2019 (the "2018-2019 Excess Policy"). A copy of the 2018–2019 Excess Policy is attached as **Exhibit C**.

19. Great American issued Excess Policy No. XSC E315871 01 00 to Plaintiffs for the "policy period" of January 28, 2019 through January 28, 2020 (the "2019–2020 Excess Policy") (the 2018–2019 Excess Policy and the 2019–2020 Excess Policy are collectively referred to as the "Excess Policies"). A copy of the 2019–2020 Excess Policy is attached as **Exhibit D**.

20. The Excess Policies follow form to the Primary Policies.

21. The Primary Policies and the Excess Policies (collectively the "Policies") provide, *inter alia,* primary and excess coverage for employee theft, forgery or alteration, loss outside the premises, and additional coverages.

22. Plaintiffs faithfully paid all premiums owed under the Policies in order to obtain insurance coverage and protection from Defendants.

23. The Policies were issued and delivered to Plaintiffs in Arizona.

24. DLC is listed as a "Named Insured" on the Named Insured Schedule of the Primary Policies.

25. DLC is listed as a "Named Insured" on the Excess Follow Form Certificate of the Excess Policies.

26. The Primary Policies also include a Joint Insured(s) endorsement (the 2019–2020 Primary Policy was modified by a Change Endorsement dated July 26, 2019) and an Automatic Coverage for Acquired Entities endorsement.

27. TCD is owned 100% by DLE.

28. DLC is the ultimate beneficial owner of TCD.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

29. Each of the Plaintiffs qualify as Named Insureds under the Policies.

30. Under Section A. Insuring Agreements of the Primary Policies, Defendants agreed to provide coverage "under the following Insuring Agreements for which a Limit Of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an 'occurrence' taking place at any time which is 'discovered' by you during the Policy Period…"

31. Under the Primary Policies, the applicable limit of insurance for Insuring Agreements A.1., A.2. and A.5., is $2,500,000 per occurrence, subject to a $50,000 per occurrence deductible.

32. The Primary Policies includes several different coverage parts, including but not limited to Employee Theft (Insuring Agreement A.1.), Forgery or Alteration (Insuring Agreement A.2.), and Outside the Premises (Insuring Agreement A.5.).

33. The "Employee Theft" Insuring Agreement A.1. of the Primary Policies provides coverage for "loss of or damage to 'money', 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee', whether identified or not, acting alone or in collusion with other persons."

34. Under the Primary Policies, the term "occurrence" is defined for purposes of Insuring Agreement A.1. to mean: "1) An individual act; 2) The combined total of all separate acts whether or not related; or 3) A series of acts whether or not related; committed by an 'employee' acting alone or in collusion with other persons, during the Policy period..."

35. Under the Primary Policies, "employee" is defined to include any natural person: (1) "whom [Plaintiffs] compensates directly by salary, wages or commissions"; and (2) "whom [Plaintiffs have] the right to direct and control while performing services."

36. The Primary Policies do not define the phrase “compensates directly.”

37. The “Forgery or Alteration” Insuring Agreement A.2. of the Primary Policies provides:

> We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:
>
> (1) Made or drawn by or drawn upon you; or
>
> (2) Made or drawn by one acting as your agent;
>
> or that are purported to have been so made or drawn.

38. Under the Primary Policies, “forgery” is defined as “the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one’s own name signed with or without authority, in any capacity, for any purpose.”

39. The Primary Policies do not define the phrase “or similar written promises.”

40. Under the Primary Policies, the term “occurrence” is defined for purposes of Insuring Agreement A.2. to mean: “1) An individual act; 2) The combined total of all separate acts whether or not related; or 3) A series of acts whether or not related; committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy period...”

41. The Primary Policies do not define the term “instruments.”

42. The “Outside the Premises” Insuring Agreement A.5. of the Primary Policies provides coverage for “Loss of ‘money’ and ‘securities’ outside the ‘premises’ in the care and custody of a ‘messenger' or an armored motor vehicle company resulting directly from ‘theft’, disappearance or destruction.”

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

43. Under the Primary Policies, "premises" is defined to mean "the interior of that portion of any building you occupy in conducting your business."

44. Under the Primary Policies, the term "messenger" is defined to mean "you, or your relative, or any of your partners or 'members', or any 'employee' while having care and custody of property outside the 'premises'."

45. The Primary Policies do not define "partner."

46. The plain and ordinary meaning of the term "partner" includes "a person who shares or is associated with another in some action or endeavor."

47. Under the Primary Policies, the term "occurrence" is defined for purposes of Insuring Agreement A.5. to mean: "1) An individual act or event; 2) The combined total of all separate acts whether or not related; or 3) A series of acts whether or not related; committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy period…"

48. The Excess Policies' Excess Follow Form Certificate states:

> The COMPANY, in consideration of an agreed premium, and in reliance upon the statements and information furnished to the COMPANY by the INSURED, and subject to the terms and conditions of the underlying coverage scheduled in Item 3. below, as excess and not contributing insurance, agrees to pay the INSURED for loss which:
>
> > (a) Would have been paid under the Underlying but for the fact that such loss exceeds the limit of liability of the Underlying Carrier(s) listed in Item 3., and
> >
> > (b) for which the Underlying Carrier(s) has (have) made payment, and the Insured has collected, the full amount of the expressed limit of the Underlying Carrier's(s) liability.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

49. Under the Excess Policies, coverage is provided for "Employee Theft, Forgery or Alteration, Inside the Premises - Theft of Money and Securities, Inside the Premises - Robbery or Safe Burglary of Other Property, Outside the Premises, Computer and Funds Transfer Fraud, Money Orders and Counterfeit Money, Clients Property," up to the single loss limit of liability of $2,500,000 at inception.

<u>Factual Background of First Loss</u>

50. Plaintiffs' First Loss results directly from Jones's theft of Plaintiffs' money and/or other property.

51. In the Spring of 2018, TCD was formed for the express purposes of purchasing and acquiring Taymouth Castle, which is located in Perthshire, Scotland (the "Property").

52. On or about April 11, 2018, DLC engaged Jirehouse pursuant to a General Terms of Engagement Letter ("Engagement Letter") to act as its partner in effecting the transaction to purchase the Property.

53. Under the terms of the Engagement Letter, Jirehouse agreed to facilitate the purchase of the Property.

54. Jirehouse agreed to provide its services to DLC "in accordance with [DLC's] instructions and [Jirehouse's] agreement to act upon them."

55. Under the Engagement Letter, DLC's engagement of Jirehouse extends to Jirehouse's parent partnership entity, Jirehouse Partners, LLP, and its wholly owned subsidiary trust corporation, Jirehouse Trustees, Ltd, as well as branches of Jirehouse in Lausanne and Nevis (collectively the "Jirehouse Entities").

56. The Engagement Letter also states that Jirehouse affiliates may provide services to Plaintiffs directly. These affiliates include: Esquiline Capital Limited, Esquiline Finance Ltd., Jirehouse Luxembourg SA, Jirehouse

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

Suisse SA, Jirehouse Trustees SARL, Jirehouse Cyprus Ltd., and Jirehouse Fiduciaries Ltd.

57. Upon information and belief, Jones was the sole manager of the Jirehouse Entities, and one of two partners at Jirehouse.

58. Jones performed services related to the purchase of the Property subject to Plaintiffs' direction and control.

59. Jones was directly compensated by Plaintiffs for these services.

60. Under the Specific Engagement Terms dated May 24, 2018, Jirehouse agreed to advise and act on the following scope of engagement:

> (a) the purchase of Taymouth Castle, Perthshire, Scotland (Property) from Mount Two Limited (the Seller) via our special purpose vehicle incorporated in respect of this matter for you and known as The River Tay Limited and to which rights will be assigned from Esquiline Asset Managers Limited (which will secure sub-sale development transfer tax relief);
>
> (b) the purchase of fractional interests in respect of the East Wing of the Property by way of acquisition of guarantee memberships in 14 English companies from Kenmore Land Limited via our other special purpose vehicle incorporated in respect of this matter for you and known as Taymouth (Suites) Limited;
>
> (c) the purchase of design and development rights and management company for the Property known as Kenmore Land Management Limited from Kenmore Land Limited via a third special purpose vehicle we have incorporated in respect of this matter known as East Wing (Management) Ltd; and
>
> (d) the structuring of the Property holding in the most tax efficient way in accordance with the tax laws and regulations of this United Kingdom.



Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

61. Jones recommended the purchase of the Property take place through a UK-registered company, Esquiline Asset Managers Limited ("EAML"), as the special purpose vehicle.

62. In the May 24, 2018 Specific Engagement Terms, EAML is described as "affiliated" to Jirehouse, and Jirehouse states that it had "employed on your behalf as a front-facing buyer" EAML.

63. EAML is a subsidiary of Esquiline Finance Limited ("EFL") and is ultimately controlled by the Jirehouse.

64. EAML's registered office is located at 7 John Street, London WCIN 2ES, the office address of Jirehouse.

65. At no point in time did Plaintiffs have any legal or beneficial interest in EAML, nor did Plaintiffs exercise any control over EAML.

66. In an email to DLC's Chief Financial Officer dated December 27, 2018, Jones further described EAML as "effectively an internally controlled vehicle (in a loose sense) … it has Jirehouse appointed UK directors, and Jirehouse Secretaries provides banking support services."

67. In correspondence between representatives of Plaintiffs and Jones, Jones characterized EAML as "technically owned by Jirehouse offshore, not Jirehouse offshore group. It was used for the deal, as requested. It has Jirehouse appointed UK directors and Jirehouse Secretaries provide banking support services."

68. At the time of the transaction, EAML was under the control of, or acted on the instructions of, Jirehouse.

69. Throughout its dealings with Plaintiffs, Jirehouse maintained a direct and personal interest in the transaction to purchase the Property.

70. Plaintiffs and EAML agreed to utilize EAML as the vehicle to purchase the Property.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

71. Under the terms of the deal, EAML would borrow money from Plaintiffs. EAML would use this money to effectuate a sub-sale of the Property to another entity, with DLC as the ultimate beneficial owner of the Property.

72. On or about April 16, 2018, the seller of the Property, Mount Two Limited, agreed to a purchase price of £10,100,000, subsequently renegotiated to £9,620,000 excluding VAT.

73. In April 2018, TCD wired a total of $14,050,000 (the "Initial Purchase Funds") to the care and custody of its partner Jirehouse's Trustees General Client Account in two separate wires.

74. Under the Specific Engagement Terms Section 6, Jirehouse acknowledged receipt of the funds and agreed that the Initial Purchase funds would be used as follows:

> We have received in our general client account the purchase proceeds in the total sum of $14,050.000 from the Company on 16th May, 2018 and have entered into an exclusivity agreement (EA) on behalf of a special purpose vehicle employed on your behalf as a front-facing buyer for the transaction, Esquiline Asset Managers Limited and affiliated to this firm, with the Seller, represented by the Seller's solicitors, Brodies LLP.

75. Plaintiffs provided the Initial Purchase Funds to Jirehouse for the express purpose of being used to purchase the Property.

76. A deposit of 10% of the purchase price, £962,000, was subsequently transferred by Jirehouse to the account designated by the seller of the Property, Mount Two Limited.

77. Plaintiffs did not consent to the use or transfer of the Initial Purchase Funds for any other purpose except the purchase of the Property.

78. Plaintiffs were unaware that, while the Initial Purchase Funds were in the care and custody of its partner Jirehouse, the Initial Purchase Funds (except for the initial 10% deposit in Paragraph 75 above) were stolen

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

by Jones. Instead, Plaintiffs were repeatedly told the monies remained safe in Jirehouse's Trustees General Client Account.

79. To complete the sale, Jirehouse acting under the direction of Plaintiffs instructed Shepard and Wedderburn, LLP, a Scottish firm, to act as local counsel and undertake due diligence on the title of the Property on behalf of Plaintiffs.

80. On or about May 30, 2018, the parties finalized the purchase contract for the Property with Mount Two Limited as seller and EAML as the buyer.

81. As part of this transaction, EAML, in exchange for a fee, agreed to take on potential liabilities arising out of the transaction and to act as a shield for Plaintiffs.

82. The transaction for the sale of the Property was to be completed in December 2018.

83. Unbeknownst to Plaintiffs, by the time the transaction was to be completed, Jirehouse no longer had the funds needed to complete the transaction because the Initial Purchase Funds had already been stolen. It appears that Jones—without Plaintiffs' authority, knowledge, or consent—took more than $12.75 million of the Initial Purchase Funds from Jirehouse's Trustees General Client Account and used the funds to make payments on liabilities and expenses owed by Jones, Jirehouse, and/or EFL to third-parties. The stolen funds have not been repaid and are unrecoverable.

84. To cover up his theft and fraud, Jones began a series of tactics to delay Plaintiffs from discovering his misdeeds.

85. On November 9, 2018, Jones requested additional capital from Plaintiffs.

86. After some negotiation, an additional $2,000,000 was transferred to Jirehouse's Trustees General Client Account. A portion of this amount was funded by TCD and the other portion was funded by an investor of Plaintiffs.

87. Through a series of misrepresentations, Jones told Plaintiffs there were compliance issues, which were causing a delay in completing the transaction, and as a result Plaintiffs needed to provide an additional $9,300,000 to complete the transaction. DLC provided these funds (the "Surplus Funds") in December 2018.

88. Jones also advised Plaintiffs that the funds received by Jirehouse from Plaintiffs from April 2018 onwards should be the subject of a December 6, 2018 Loan Facility Agreement prepared by Jones.

89. Jones used the Loan Facility Agreement as a tactic to further cover up his theft.

90. After the purchase of the Property was completed in December 2018, Plaintiffs requested the return of all the Surplus Funds.

91. Unbeknownst to Plaintiffs, Jones was unable to return the Surplus Funds because he had used a portion of Plaintiffs' funds to purchase the Property and had misappropriated the rest from the care and custody of Jirehouse.

92. To further his theft and fraud, between the end of January and early March 2019, Jones resurrected supposed compliance concerns, and then created further substantial delay by making a suspicious activity report. During this time, Jones assured Plaintiffs that the Surplus Funds remained in possession of Jirehouse. None of these representations were true.

93. On March 6, 2019, Plaintiffs discovered that Jones and Jirehouse had no intention of repaying the funds and that Jones had in fact stolen the funds.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

94. Plaintiffs transferred the Initial Purchase Funds into the care and custody of Jirehouse for the limited purpose of purchasing the Property. For purposes of the transaction to purchase the Property, Jirehouse was Plaintiffs' "partner," as that term is commonly understood and used in the Primary Policies.

95. While the Initial Purchase Funds were in the care and custody of Jirehouse, Jones, who was directly compensated by Plaintiffs and whom Plaintiffs had the right to direct and control while performing services for Plaintiffs, stole at least $12,754,185.99 of the Initial Purchase Funds. To date, these funds have not been repaid or recovered.

<u>Factual Background of Second Loss</u>

96. In late 2018, a person, believed to be John Clark ("Clark"), forged an application to procure a loan from Octopus Property, which is the parent company of Dragonfly Finance S.A.R.L.("Dragonfly").

97. The application was drafted and submitted without the knowledge or approval of Plaintiffs.

98. The loan application contained a forged signature and information of DLC's ultimate beneficial owner, Michael Meldman, as a Guarantor and ultimate beneficial owner of the loan.

99. Upon information and belief, the information and signature on the loan application were forged with the intent to deceive the lender into granting the loan.

100. Based on the forged loan application, the lender processed and ultimately issued the loan (the "Dragonfly Facility"), under which the lenders agreed to provide a facility to The River Tay Castle LLP ("RTC") of up to £5,076,528.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

101. The forgery on the application created a written promise to pay a sum certain that resulted in an unauthorized loan being drawn against the Property.

102. On or about February 21, 2019, Clark executed a charge that essentially pledged the Property as security for any amounts owed under the Dragonfly Facility (the "Dragonfly Charge").

103. Clark did not have authority to sign the Dragonfly Facility or the Dragonfly Charge and/or arrange and execute them and/or draw down any sums under the Dragonfly Facility.

104. Clark applied for and took out the loan in the name of RTC. RTC is ultimately owned and controlled by Plaintiffs.

105. Under the Dragonfly Facility a total £4,980,479 was drawn down (the "Dragonfly Monies") with assistance from Clark.

106. Upon information and belief, the Dragonfly Monies were originally transferred into a client account of Jirehouse and then the entirety of these funds left that account the next day as a loan to EAML and/or EFL.

107. In March 2019, Plaintiffs discovered the existence of the Dragonfly Charge and the fraud and losses arising from the loan application, the Dragonfly Facility, and the Dragonfly Charge.

108. Plaintiffs did not consent to the Dragonfly Facility or Dragonfly Charge, or any similar change, being entered into against the Property on behalf of RTC as an agent of its ultimate beneficial owners, DLC and DLE.

109. Plaintiffs have never received the Dragonfly Monies.

110. The forgery on the loan application created a written promise to repay an unauthorized loan that was secured by the Property, directly causing substantial loss to Plaintiffs.

111. As a result of the forged loan application, Dragonfly Facility, and Dragonfly Charge, Plaintiffs' ownership of the Property was put at risk.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

112. Plaintiffs further incurred substantial monetary losses as a result of the forged loan application, including but not limited to fees and interest owed on the Dragonfly Facility.

113. To preserve their interest in the Property, Plaintiffs were forced to agree to a settlement with Dragonfly under which Plaintiffs were required to pay £4,980,479 to Dragonfly to pay off the outstanding balance of the Dragonfly Facility and obtain a release of Dragonfly's secured interest in the Property.

114. TCD has paid the U.S. Dollar equivalent of £4,980,479 (more than USD $5 million) to Dragonfly as part of the settlement in Paragraph 112.

<u>Defendants Deny Coverage for Plaintiffs' Claims</u>

115. On July 30, 2019, Plaintiffs submitted two separate Proofs of Loss as required under the Policies.

116. On August 28, 2019, a Senior Claims Specialist for Berkley notified Plaintiffs that Berkley had retained the law firm of Goldberg Segalla as an investigator to assist in Berkley's investigation of Plaintiffs' two losses. According to the Senior Claims Specialist, the attorney investigator would "need to travel to interview people/review documents in Arizona and/or London…"

117. On September 4, 2019, a Claim Director for Great American notified Plaintiffs that Great American had retained the law firm of Eckert Seamans Cherin & Mellott as an investigator to assist in Great American's investigation of Plaintiffs' two losses.

118. By letter dated May 21, 2020, Berkley issued a written denial of Plaintiffs' insurance claims under the 2019–2020 Primary Policy.

119. Despite the voluminous amount of information available to Berkley, Berkley failed to perform a proper investigation of Plaintiffs'

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

insurance claims and declined to review documents related to Plaintiffs' claims that were in hard copy format in London.

120. Further, Berkley's superficial denial was issued an excessive nine months from the date it received Plaintiffs' two Proofs of Loss.

121. Further, Berkley failed to inform Plaintiffs that Berkley contends that Plaintiffs' losses may not be covered under the 2019–2020 Policy because Berkley contends the losses may have been "discovered" during the "policy period" of the 2018–2019 Primary Policy and not during the "policy period" of the 2019–2020 Primary Policy.

122. Further, Berkley failed to investigate or evaluate whether Plaintiffs' losses were covered under the 2018–2019 Primary Policy.

123. By letter dated June 1, 2020, Great American issued a written denial of Plaintiffs' insurance claims under the 2019–2020 Excess Policy.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

## Count One

## Declaratory Judgment – First Loss

(Against all Defendants)

124. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

125. This cause of action is raised under A.R.S. Sections 12-1831 through 12-1846.

126. There is a dispute between Plaintiffs and Defendants regarding the parties' respective rights and interests under the Policies.

127. Plaintiffs are entitled to indemnification from Defendants under Insuring Agreement A.1. of the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, for their loss of the Initial Purchase Funds resulting from Jones's theft of the Initial Purchase Funds.

128. Plaintiffs are also entitled to indemnification from Defendants under Insuring Agreement A.5 of the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, for their loss of the Initial Purchase Funds while the funds were in the care and custody of Jirehouse, which was Plaintiffs' "partner" for the purpose of purchasing the Property, as the term "partner" is commonly understood and used in the Policies.

129. Defendants dispute and deny any obligation to indemnify Plaintiffs for their loss of the Initial Purchase Funds.

130. Plaintiffs are entitled to a declaratory judgment from this Court holding that Defendants are obligated under the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively under the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, to indemnify Plaintiffs for their loss of the Initial Purchase Funds.

131. This cause of action arises out of a contract between Plaintiffs and Defendants. Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs under A.R.S. Sections 12-341 and 12-341.01.

**Count Two**

**Declaratory Judgment – Second Loss**

(Against all Defendants)

132. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

133. This cause of action is raised under A.R.S. Sections 12-1831 through 12-1846.

134. There is a dispute between Plaintiffs and Defendants regarding the parties' respective rights and interests under the Policies.

135. Plaintiffs are entitled to indemnification from Defendants under Insuring Agreement A.2. of the 2019–2020 Primary Policy and the 2019–2020

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, for their losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge.

136. The losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge are the result of a separate and distinct "occurrence" from the loss of the Initial Purchase Funds.

137. Defendants dispute and deny any obligation to indemnify Plaintiffs for their losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge.

138. Plaintiffs are entitled to a declaratory judgment from this Court holding that Defendants are obligated under the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively under the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, to indemnify Plaintiffs for their losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge.

139. This cause of action arises out of a contract between Plaintiffs and Defendants. Plaintiffs is entitled to an award of their reasonable attorneys' fees and costs under A.R.S. Sections 12-341 and 12-341.01.

**Count Three**

**Breach of Contract – First Loss**

(Against all Defendants)

140. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

141. Plaintiffs and Defendants are parties to the Policies, which are express contracts.

142. Plaintiffs have substantially performed their obligations under the Policies.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

143. Plaintiffs have complied with all conditions precedent, or such conditions have been waived, or Defendants are otherwise estopped from asserting same.

144. Defendants' denial of Plaintiffs' claim for coverage of Plaintiffs' loss of the Initial Purchase Funds and Defendants' failure to promptly pay for Plaintiffs' loss of the Initial Purchase Funds constitutes a material breach of the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy.

145. As a direct and proximate result of Defendants' breach of the2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, Plaintiffs have sustained damages in an amount to be proven at trial.

146. This cause of action arises out of a contract between Plaintiffs and Defendants. Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs under A.R.S. Sections 12-341 and 12-341.01.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

**Count Four**

**Breach of Contract – Second Loss**

(Against all Defendants)

147. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

148. Plaintiffs and Defendants are parties to the Policies, which are express contracts.

149. Plaintiffs have substantially performed their obligations under the Policies.

150. Plaintiffs have complied with all conditions precedent, or such conditions have been waived, or Defendants are otherwise estopped from asserting same.

151. Defendants' denial of Plaintiffs' claim for coverage of its losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge and in failing to promptly pay for Plaintiffs' losses resulting from the forged loan application, the Dragonfly Facility, and the Dragonfly Charge constitutes a material breach of the 2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy.

152. As a direct and proximate result of Defendants' breach of the2019–2020 Primary Policy and the 2019–2020 Excess Policy, or alternatively of the 2018–2019 Primary Policy and the 2018–2019 Excess Policy, Plaintiffs have sustained damages in an amount to be proven at trial.

153. This cause of action arises out of a contract between Plaintiffs and Defendants. Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs under A.R.S. Sections 12-341 and 12-341.01.

Snell & Wilmer L.L.P. LAW OFFICES One Arizona Center, 400 E. Van Buren, Suite 1900 Phoenix, Arizona 85004-2202 602.382.6000

**Count Five**

**Bad Faith**

(Against Defendant Berkley)

154. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

155. The Primary Policies contain an implied covenant of good faith and fair dealing on the part of Berkley.

156. That duty dictates that Berkley refrain from acting in a manner that would impair the right of Plaintiffs to receive the benefits that flow from and that Plaintiffs have a right to expect from the Primary Policies.

157. Berkley breached its duty of good faith and fair dealing, including its obligations under Ariz. Admin. Code § R20-6-801 to promptly acknowledge pertinent communications and engage in prompt, fair, and equitable settlement process, when it:

a. Failed to acknowledge Plaintiffs' Proofs of Loss within ten working days;

b. Failed to complete its investigation within thirty days after receiving notice of Plaintiffs' claims;

c. Failed to provide notice to Plaintiffs of its denial within fifteen working days after it received Plaintiffs' properly executed Proofs of Loss; d. Failed to provide Plaintiffs with any written notification of why additional time was needed for its investigation;

e. Concealed and failed to fully disclose to Plaintiffs that their losses may have been "discovered" during the "policy period" of the 2018–2019 Primary Policy and that Plaintiffs losses may be covered by the 2018–2019 Primary Policy; and

f. Failed to investigate and evaluate coverage for Plaintiffs' losses under the 2018–2019 Primary Policy.

158. Berkley intentionally and without reasonable basis denied coverage to Plaintiffs for its First Loss and Second Loss.

159. Berkley failed to conduct a timely, reasonable, adequate, and unbiased investigation of the facts and law concerning coverage for Plaintiffs' losses.

160. Berkley failed to adequately consider information provided by Plaintiffs in support of its claims under the Policies.

161. Berkley intentionally and unreasonably required Plaintiffs to engage legal counsel to protect their rights and required Plaintiffs to file suit to secure coverage and a defense under the Policies.

162. Berkley committed other acts of bad faith that will be disclosed through further discovery and investigation.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

163. As a direct and proximate result of Berkley's bad faith, Plaintiffs have suffered economic, consequential, and general damages in an amount to be proved in the trial of this matter.

164. Berkley's acts and omissions were committed with an "evil mind," to serve its own interests, and with a conscious disregard of Plaintiffs' rights and interests. Accordingly, Plaintiffs are entitled to an award of punitive damages against Berkley in an amount sufficient to punish and deter Berkley and other similarly-situated insurance companies from engaging in similar conduct in the future.

165. This cause of action arises out of a contract between Plaintiffs and Defendants. Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs under A.R.S. Sections 12-341 and 12-341.01.

<u>Prayer for Relief</u>

WHEREFORE, Plaintiffs requests that judgment be entered in their favor and against Defendants as follows:

a. For a declaratory judgment declaring that Defendants are obligated to indemnify and pay the full amount of Plaintiffs' losses;

b. For an award of compensatory, consequential, and incidental damages resulting from Defendants' breaches of the Policies in an amount to be proven at trial;

c. For an award of Plaintiffs' damages incurred as a result of Berkley's bad faith;

d. For an award of punitive damages against Berkley in a just and reasonable amount sufficient to punish and deter Berkley and other similarly-situated insurance companies from engaging in similar conduct in the future;

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

e. For an award of Plaintiffs' reasonable attorneys' fees and taxable costs that Plaintiffs incur herein, pursuant to A.R.S. Sections 12-341 and 12-341.01;

f. For pre-judgment interest and post-judgment interest as and to the fullest extent permitted by law; and

g. For such other relief as the Court deems just and proper.

DATED this 4th day of December, 2020.

SNELL & WILMER L.L.P.

By: s/Robert F. Kethcart
Anthony W. Merrill
Robert F. Kethcart
*Attorneys for Plaintiffs*

Snell & Wilmer L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**CERTIFICATE OF SERVICE**

I certify that, on December 4, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which automatically sends a Notice of Electronic Filing to all counsel of record.

s/Elysa Hernandez

4835-4174-8947