**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Discovery Land Company LLC, et al., | No. CV-20-01541-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Berkley Insurance Company, et al., | |
| Defendants. | |

Pending before the Court are two discovery disputes between the parties. (Docs. 60, 65.) On December 10, 2021, the Honorable John J. Tuchi, presiding District Court judge, referred the disputes to this Court. (Doc. 68.) The Court will address each dispute.

## I.    Summary of Conclusions.

Plaintiff DLC has alleged they were defrauded by an attorney out of almost $18 million dollars in connection with the purchase of a castle in Scotland in 2018 and 2019. Plaintiffs argue that, when they uncovered the fraud, it was immediately apparent they would need legal advice regarding litigation options and insurance coverage. Similarly, Defendants argue that when they received insurance claims from Plaintiffs for those losses, it was immediately apparent to Defendants they would need legal advice regarding payment of the claims. The Court agrees with both parties. Yet, each side now wants the Court to find that what is good for their goose does not apply to the gander.

The parties have submitted briefing on the issues (*see* docs. 60, 65, 66, 67, 72, 73,

74), and the Court has held oral argument (doc. 75). The Court concludes it is no surprise, now or then, that a case like this was filed and, for the reasons explained in detail below, the Court finds that both parties' claims of attorney-client and work product privilege are well taken. The fact that both parties communicated with and involved insurance brokers or coverage counsel does not vitiate the asserted privilege of either party. Finally, the Court concludes that an *in camera* review of some communications is necessary under the crime-fraud exception. Four months after Plaintiffs uncovered the fraud, Plaintiffs requested Defendant Berkley Insurance Company retroactively provide coverage to *inter alia* Taymouth Castle DLC (TCD) (a party in the case). *One day* after Defendant BIC agreed to retroactively add coverage to TCD, Plaintiffs submitted their insurance claims for almost $18 million dollars. These and other facts are sufficient to require Plaintiffs to provide the Court with unredacted copies of all communications listed in Plaintiffs' privilege log between January 28, 2019 and July 30, 2019 (doc. 66-1 at 26-272). Following the Court's *in camera* review of the provided materials under this exception, the Court will issue an order directing Plaintiffs what documents of the selection, if any, must be produced to Defendants.

## II.    Background.

### a.    Underlying Facts and Claims.

This action arises out of a first-party insurance coverage dispute between Plaintiffs Discovery Land Company, LLC (DLC), Discovery Land Enterprises, LLC (DLE), and Taymouth Castle DLC, LLC (TCD) and Defendants Berkley Insurance Company (BIC) and Great American Insurance Company (GAIC). Because the facts underlying the parties' insurance dispute are relevant to resolution of the parties' current multiple discovery disputes, the Court will briefly summarize them here.

#### 1.    Policies.

Plaintiff DLC is a real-estate development company with ownership and business interest in numerous subsidiaries used to facilitate projects around the world. In early 2018,

Defendants BIC and GAIC issued separate insurance policies[1] – the Primary Policy and the Excess Policy, respectively – to Plaintiff DLC for the policy period of January 28, 2018 through January 28, 2019. (Doc. 37 at 3-4.) BIC and GAIC subsequently issued two additional policies[2] to Plaintiff to provide coverage for the policy period of January 28, 2019 through January 28, 2020. (*Id.*) Collectively, the Policies provide *inter alia* primary and excess coverage for employee theft, forgery or alteration, and loss outside the premises. (*Id.* at 4.) DLC is listed as the "Named Insured" on both the Primary and Excess Policies. (*See* Doc. 37 at 4.)

Plaintiff TCD is an entity that was formed in the Spring of 2018 for the express purpose of purchasing and acquiring Taymouth Castle, which is located in Perthshire, Scotland. (Doc. 37 at 8.) Plaintiff TCD is "owned 100% by [Plaintiff] DLE." (*Id.* at 4.) The parties dispute whether Plaintiff TCD qualifies as a named insured under the Policies. (*Compare* Doc. 37 at 5 (stating "Each of the Plaintiffs qualify as Named Insureds under the Policies."); Doc. 40 at 6 (denying Plaintiffs' allegation that each of the Plaintiffs qualifies as a Named Insured).)

### 2.    Notice of Loss Claim.

On March 18, 2019, DLC, through its insurance brokers Smith McGehee Insurance Services (SMIS) and CRC Insurance Services (CRC), notified Defendants of a potential claim under the policies. (*See* Doc. 66 at 3.) Specifically, the Notice of Loss Claim stated:

> Please be advised that we need to put you notice [sic] with regards to a crime incident the insured is still investigating. Initial feedback is that the insured has experienced a theft of funds perpetrated by their legal team. The insured is in the process of putting together additional information, but in the meantime please confirm receipt and setup claim files at your earliest.

(Doc. 66 at 3.)

### 3.    Plaintiff DLC Requests Retroactive Addition of TCD and DeJoria Trust.

[1] Specifically, BIC issued Policy No. BCCR-45002757-20 (the "Primary Policy"), and GAIC issued Policy No. XSC E315871 00 00 (the "Excess Policy"), as defined by the parties. (*See* Doc. 37 at 3-4.)
[2] BIC issued Policy No. BCCR-45002757-21, and GAIC issued Policy No. XSC E315871 01 00. (Doc. 37 at 3-4.)

On July 26, 2019, BIC received an email from CRC, forwarded from SMIS, requesting BIC to add Plaintiff TCD and non-party DeJoria Trust as Joint Insureds to the Primary Policy, retroactive to January 28, 2019. (*See* Doc. 66 at 3; Doc. 67-1 at 7.) "Notably, and despite DLC having previously requested numerous entities be added as Joint Insureds, this was the first time DLC requested an endorsement be made retroactive." (Doc. 66 at 3.) On July 29, 2019, BIC issued Endorsement No. 24, adding TCD and DeJoria Trust as Joint Insureds for the first time. (*Id.* at 4.)

### 4.    Plaintiff DLC Submits Two Proofs of Loss.

On July 30, 2019, the day after BIC issued Endorsement No. 24, DLC submitted two proofs of loss claiming losses incurred, in whole or in part, by TCD and the DeJoria Trust. (*See* Doc. 66 at 4; Doc. 37 at 8-17.)

### A.    Plaintiffs' First Loss.

Plaintiffs' first loss allegedly resulted from U.K. Solicitor Stephen Jones's theft of money that Plaintiff TCD had entrusted to its English Partner, Jirehouse, in connection with purchasing the Taymouth Castle. (*See* Doc. 37 at 8-14, Doc. 67 at 3.) Specifically, Plaintiffs allege that "In April 2018, TCD wired a total of $14,050,000 (the "Initial Purchase Funds") to the care and custody of its partner Jirehouse's Trustees General Client Account in two separate wires." (*Id.* at 11.) "Plaintiffs provided the Initial Purchase Funds to Jirehouse for the express purpose of being used to purchase the Property." (*Id.*) On or about May 30, 2018, the Plaintiffs finalized the purchase contract for the property with the sellers. (*Id.* at 12.) "The transaction for the sale of the Property was to be completed in December 2018." (*Id.*)

> Unbeknownst to Plaintiffs, by the time the transaction was to be completed, Jirehouse no longer had the funds needed to complete the transaction because the Initial Purchase Funds had already been stolen. It appears that Jones— without Plaintiffs' authority, knowledge, or consent— took more than $12.75 million of the Initial Purchase Funds from Jirehouse's Trustees General Client Account and used the funds to make payments on liabilities and expenses owed by Jones, Jirehouse, and/or EFL to third-parties. The stolen funds have not been repaid and are unrecoverable.

(*Id.*)

Plaintiffs allege that between May 2018 and March 2019, Jones engaged in "a series of tactics to delay Plaintiffs from discovering his misdeeds[,]" including requesting additional capital in November 2018, and raising false compliance issues to secure surplus funds between December 2018 and March 2019. (*Id.* at 12-13.) "On March 6, 2019, Plaintiffs discovered that Jones and Jirehouse had no intention of repaying the funds and that Jones had in fact stolen the funds." (*Id.* at 13.) "While the Initial Purchase Funds were in the care and custody of Jirehouse, Jones . . . stole at least $12,754,185.99 of the Initial Purchase Funds. To date, these funds have not been repaid or recovered." (*Id.* at 14.)

## B.     Plaintiffs' Second Loss.

Plaintiffs allege that their second loss of £4,980,479.00 resulted from "a forgery of a written promise resulting in an unauthorized loan taken out after the purchase of Taymouth Castle, which was signed by John Clark and secured by the castle property." (Doc. 37 at 14-16.) Specifically, in late 2018, a person – believed to be Clark – forged an application to procure a loan from a non-party lender. (*Id.* at 14.) The application, which was drafted without the knowledge or approval of Plaintiffs, contained a forged signature and information of DLC's ultimate beneficial owner as a Guarantor and ultimate beneficial owner of the loan. (*Id.*) Based on the forged loan application, the lender processed and issued the loan, under which the lenders agreed to provide up to £5,076,528. (*Id.*)

"The forgery on the application created a written promise to pay a sum certain that resulted in an unauthorized loan being drawn against the Property." (*Id.* at 15.) "On or about February 21, 2019, Clark executed a charge that essentially pledged the Property as security for any amounts owed under the loan. (*Id.*)

In March 2019, Plaintiffs discovered the existence of the loan and the fraud and losses arising from the forged loan application. (*Id.*) "To preserve their interest in the Property, Plaintiffs were forced to agree to a settlement with [the lender] under which Plaintiffs were required to pay £4,980,479 to [the lender] to pay off the outstanding balance of the [loan] and obtain a release of [the lender's] secured interest in the Property." (*Id.* at 16.) Plaintiff TCD has paid the U.S. Dollar equivalent of £4,980,479 (more than USD $5

1  million) to the lender as part of the settlement. (*Id.*)

2          **5.      Denial of Plaintiffs' Claims.**

3          On August 28, 2019, BIC notified Plaintiffs that it had retained the law firm of

4  Goldberg Segalla to assist in Berkley's investigation of Plaintiffs' two losses. (Doc. 37 at

5  16.) On May 21, 2020, BIC issued a written denial of Plaintiffs' insurance claims under

6  the Primary Policy. (*Id.*) On June 1, 2020, GAIC issued a written denial of Plaintiffs'

7  insurance claims under the Excess Policy. (*Id.* at 17.)

8          **b.      Filing of this Action.**

9          On June 25, 2020, Plaintiffs filed a complaint against Defendants in the Maricopa

10 County Superior Court. (Doc. 1-3.) On August 8, 2020, Defendant BIC removed the matter

11 to this Court on the basis of diversity jurisdiction, initiating this action. (Doc. 1.) On

12 December 4, 2020, the Court held a Scheduling Conference, and issued a Scheduling Order

13 in this action. (Docs. 33, 34.)[3] That same day, Plaintiffs filed their First Amended

14 Complaint (FAC) against Defendants. (Doc. 37.)

15         In their FAC, Plaintiffs seek *inter alia* declaratory judgment that Defendants have

16 wrongfully refused to indemnify Plaintiffs for two insured losses under a commercial crime

17 policy BIC issued to DLC (Primary Policy) and an excess policy GAIC issued to DLC

18 (Excess Policy). (*Id.*) Plaintiffs allege that the first loss resulted from a U.K. solicitor's

19 theft of approximately $12,754,185.99 that Plaintiffs had entrusted to an English partner,

20 Jirehouse, to facilitate purchasing the Taymouth Castle in Perthshire, Scotland. (*Id.* at 8-

21 14.) Plaintiffs allege the second loss of £4,980,479.00 resulted from "a forgery of a written

22 promise resulting in an unauthorized loan taken out after the purchase of Taymouth Castle,

23 which was signed by John Clark and secured by the castle property." (*Id.* at 14-16.)

24         All told, Plaintiffs seek approximately $18 million from Defendants for their alleged

25 wrongful denials of Plaintiffs' two loss claims under the Policies. (*See* Docs. 37, 66 at 2,

26 and 67 at 2-3.) Plaintiffs also assert that Defendant BIC has breached its obligation of good

27
28 ───────────────
[3] The Court has since granted two extensions of the case management deadlines. (Docs. 59, 64.) The current discovery deadline is March 11, 2022, and the dispositive motion deadline is April 8, 2022. (*See* Doc. 64.)

1  faith and fair dealing. (Doc. 37 at 21-23; Doc. 67 at 3.)

2        **c.**    **Answers and Counterclaims.**

3        On December 18, 2020, Defendants BIC and GAIC each filed an Answer and

4  Counterclaim to Plaintiffs' Amended Complaint. (*See* Docs. 39, 40.) Therein, Defendants

5  allege that, on July 26, 2019, Plaintiff DLC sought to retroactively include additional

6  entities, including Plaintiff TCD, as insureds under the Policies, as if they had been covered

7  since January 28, 2019. But Plaintiffs did not inform Defendants that TCD had already

8  incurred a loss as alleged in Plaintiffs' Amended Complaint. (*See id.*) On July 29, 2019,

9  BIC issued the requested retroactive endorsements. (*Id.*) Therefore, Defendants allege

10  Plaintiffs' "failure to disclose that TCD already incurred a loss when [DLC] requested that

11  it be included as an insured constitutes a fraudulent and material misrepresentation,

12  omission, concealment of fact or incorrect statement that was material to the acceptance of

13  the risk or to the hazard assumed by BIC." (Doc. 40 at 39. *See also* Doc. 39 at 31.)

14        Accordingly, Defendants seek recission of the retroactive endorsements under Ariz.

15  Rev. Stat. § 20-1109 and common law. (*Id.*) On January 8, 2021, Plaintiffs filed an Answer

16  to each Counterclaim. (Docs. 41, 42.)

17        **d.**    **Pending Discovery Disputes.**

18           **1.**    **First Joint Notice.**

19        On November 15, 2021, the parties filed their first Joint Notice of Discovery Dispute

20  (First Joint Notice). (Doc. 60.) Therein, Defendants argue that Plaintiffs have improperly

21  withheld discovery pursuant to the attorney-client privilege and the work product

22  protection, and seek a court order directing Plaintiffs to withdraw their work product claims

23  and to order an in camera review of the remaining documents to determine the validity of

24  Plaintiffs' attorney-client privilege claims. Plaintiffs oppose Defendants' request. (*Id.*) On

25  November 17, 2021, the Court ordered the parties to submit briefing regarding their dispute

26  in the First Joint Notice. (Doc. 63.) On November 25, 2021, Defendants submitted their

27  brief in support of their position in the First Joint Notice. (Doc. 66.) On December 1, 2021,

28  Plaintiffs filed their Response in opposition to Defendants' Brief. (Doc. 67.)

2.     **Second Joint Notice.**

On November 23, 2021, the parties filed a second Joint Notice of Discovery Dispute (Second Joint Notice). (Doc. 65.) Therein, Plaintiffs assert that Defendant BIC has improperly withheld discovery pursuant to the attorney-client privilege and work product protection and seek a court order directing BIC to produce the withheld documents. (*Id.* at 2.) On December 15, 2021, the Court ordered the parties to submitted briefing regarding the dispute in the Second Joint Notice. (Doc. 71.) In that same order, the Court set a hearing on both the First and Second Joint Notice to be held on January 11, 2022. (*Id.* at 2.) On December 29, 2021, Plaintiffs filed their Brief in Support of their Position in the Second Joint Notice. (Doc. 72.) On January 6, 2022, Defendants BIC and GAIC each submitted their response to Plaintiffs' Brief. (Docs. 73, 74.)

e.     **Discovery Hearing.**

On January 11, 2022, the parties appeared before the Court for a discovery hearing on both the First and Second Joint Notice. (Doc. 75.)

III.   **Analysis.**

Based on discussions held with the parties at the hearing (doc. 75), and the parties' filings on both the First and Second Joint Notice (docs. 60, 65, 66, 67, 72, 73, 74), the Court finds three primary issues in dispute: (1) the timing of each party's claims of work product protection; (2) the validity of each party's claims of attorney-client privilege related to communications with certain third-party agents; and (3) whether the crime fraud exception applies to certain documents that Plaintiffs claim are protected by attorney-client privilege.

a.     **Work Product Protection.**

Both parties have withheld responsive documents from production pursuant to the work product protection. Both parties assert that the opposing parties claims of work product protection are improper. The Court will address each party's claims.

1.     **Legal Standard.**

To qualify for work-product protection, documents must: (1) be "prepared in

anticipation of litigation or for trial" and (2) be prepared "by or for another party or by or for that other party's representative." *In re Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt.*, 357 F.3d 900, 907 (2003); Fed. R. Civ. P. 26(b)(3). "[T]he work product doctrine applies to documents created by investigators working for attorneys, provided the documents were created in anticipation of litigation." *In re Grand Jury Subpoena*, 357 F.3d at 907 (citing *United States v. Nobles*, 422 U.S. 225, 239 (1975)). The party asserting the work-product immunity has the burden of demonstrating that the at-issue documents are work-product. *Hernandez v. Tanninen*, 604 F.3d 1095, 1102 (9th Cir. 2010) (recognizing burden is on party invoking work-product immunity).

To determine whether a document qualifies for protection under the work-product protection, the Ninth Circuit has adopted a broad "because of" test. *See In re Grand Jury*, 13 F.4th 710, 714 (9th Cir. 2021). The "because of" test "does not consider whether litigation was a primary or secondary motive behind the creation of a document." *Id.* (citing *In re Grand Jury Subpoena*, 357 F.3d at 908). "It instead 'considers the totality of the circumstances and affords protection when it can fairly be said that the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation.'" *Id.*

The purpose of the work-product protection is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *Id.* at 715 (quoting *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998).) "[T]he work-product doctrine upholds the fairness of the adversarial process by allowing litigators to creatively develop legal theories and strategies—without their adversaries invoking the discovery process to pry into the litigators' minds and free-ride off them." *Id.* (citing *Allen v. Chi. Transit Auth.*, 198 F.R.D. 495, 500 (N.D. Ill. 2001) (explaining that the intent of the work-product doctrine "is to protect the adversarial process by providing an environment of privacy" and insure "that the litigator's opponent is unable to ride on the litigator's wits")). *Id.*

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.    Plaintiffs' Claims of Work-Product Protection.

In the First Joint Notice, Defendants assert that Plaintiffs have improperly withheld documents pursuant to the work product protection that were created prior to Defendants' denial of Plaintiffs' claims. (Doc. 60 at 2.) Specifically, Defendants argue that Plaintiffs' claims of work product protection for documents dating back as early as March 14, 2019 is improper because Plaintiffs did not notify BIC of their claims until March 18, 2019, or provide their proof of loss until July 30, 2019, and BIC did not make a coverage determination until April 3, 2020. (*Id.*)

In response, Plaintiffs argue that "[d]ue to the value and nature of the loss, Plaintiffs anticipated the probability of litigation to obtain the coverage to which Plaintiffs are entitled from the outset." (*Id.* at 3 (citing *In re Grand Jury*, 357 F.3d at 907 (documents prepared for a dual purpose were protected by the work-product doctrine because "the treat of impending litigation animated every document [the attorney's agent] prepared.")).) In a declaration provided by Plaintiff DLC's general counsel, Mr. Jeffrey D. Holland, Mr. Holland states that

> Given the complex nature of these insurance claims, and the substantial amount of damages suffered by Plaintiffs, I anticipated that litigation would be necessary to resolve the disputed insurance coverage issues since initially learning of the loss in March 2019, as I was already dealing with multiple legal matters overseas involving the subject matter of the insurance claim.

(Doc. 67-1 at 4, ¶ 14.)

At the hearing, the Court heard from all parties on this issue. Defendants reiterated that it is "not reasonable" for a party to anticipate litigation prior to providing an insurance carrier with a notice of claim. Specifically, Defendants argued that:

> In making the distinction between the communications in this March 2019 timeframe when the Plaintiffs claim work product vs attorney client claims. So, work-product, in my experience and looking at the cases that have been cited, it would be unprecedented to say that you can reasonably anticipate litigation before you even made a claim. I can't think of a single case in an insurance context that has said before a claim is even given to the carrier, we anticipate litigation. In that case you have no idea what the carrier's position would be, you have no idea what facts might be revealed in investigation. If they anticipated litigation, it simply wasn't reasonable.

1   (Audio Recording of January 11, 2022 Hearing at 10:29:50–10:30:40.) Defendants'

2   argument is not persuasive.

3          As stated at the hearing, it seems reasonable to the Court that, given the complexity

4   of Plaintiffs' underlying insurance claims, the value of the loss asserted, and Plaintiffs'

5   representation that litigation was anticipated because Plaintiffs were "already dealing with

6   multiple legal matters overseas involving the subject matter of the insurance claim[,]"

7   Plaintiffs anticipated litigation regarding their claims prior to Defendants' actual denial of

8   those claims. Defendants have not cited, nor has the Court found, any case law supporting

9   that proposition that it is impossible for a party to anticipate litigation of an imminent

10  insurance claim prior to filing or receiving a denial of that claim. Considering the totality

11  of the circumstances, the Court finds that Plaintiffs' assertions of work-product protection

12  are reasonable. *See In re Grand Jury*, 13 F.4th at 714.

13         Accordingly, the Court will deny Defendants' request to set those work-product

14  claims aside.

### 3.      Defendants' Claims of Work-Product Protection.

16         In the Second Joint Notice, Plaintiffs assert that Defendants have improperly

17  withheld, pursuant to the work-product doctrine, documents created after April 2, 2020.

18  (Doc. 65 at 2.) Specifically, Plaintiffs argue that the work-product doctrine "does not

19  protect [BIC's] documents prepared before May 21, 2020," because BIC "did not formally

20  deny Plaintiff's [sic] claims until May 21, 2020, and there is no basis to find that documents

21  created between April 2, and May 21, 2020 were prepared or obtained because of the

22  prospect of litigation rather than as part of [BIC's] ordinary business." (Doc. 72 at 9.)

23         In response, Defendants argue that BIC reasonably anticipated litigation not later

24  than April 3, 2020, because that is the date on which Mr. Oliva provided BIC with a "letter

25  containing Mr. Oliva's legal analysis relating to DLC's claims" recommending that those

26  claims be denied. (Doc. 74 at 8-10.) Defendants also provide a sworn declaration from

27  Mr. Oliva, stating that "No later than April 3, 2020, all documents and communications I

28  prepared were done so in anticipation of litigation." (Doc. 74-2 at 3, ¶ 7.)

1    The Court finds that Defendants have sufficiently shown that documents created
2    after April 3, 2020 in anticipation of litigation are protected by the work-product doctrine.
3    Although "[m]aterials prepared as part of insurance claim investigations are generally not
4    considered work product due to the industry's need to investigate claims[,]" the nature of
5    the insurer's investigation "may shift from an act taken in the ordinary course of business
6    to an act undertaken in anticipation of litigation when a sufficient degree of adversity arises
7    between the insurer and the insured." *Labertew v. Chartis Prop. Cas. Co.*, 2018 WL
8    1876901, *2 (D. Ariz. April 19, 2018) (internal quotation omitted).

9    Here, Defendants' assertion that their receipt of Mr. Oliva's April 3, 2020 letter
10   detailing his legal analysis and recommending that DLC's claims be denied gave rise to
11   Defendants' anticipation of litigation is sufficient to establish that materials prepared after
12   that date are properly protected under the work-product doctrine. *See Centex Homes v.*
13   *NGM Ins. Co.*, No. CV-19-01392-PHX-MTL, 2020 WL 5593759, at *4 (D. Ariz. Sept. 18,
14   2020) (finding that materials prepared as part of insurance claim investigations may be
15   deemed eligible for work-product protection if "in light of the nature of the document and
16   factual situation in the particular case, the document can be fairly said to have been
17   prepared or obtained because of the prospect of litigation.") (citing *In re Grand Jury*
18   *Subpoena*, 357 F.3d at 907), *reconsideration denied sub nom. Homes v. NGM Ins. Co.*, No.
19   CV-19-01392-PHX-MTL, 2020 WL 5819565 (D. Ariz. Sept. 30, 2020).

20   Accordingly, the Court will deny Plaintiffs' request to set aside Defendants' claims
21   of work-product protection for documents created after April 3, 2020.

22       **b.    Attorney-Client Privilege.**

23   Both parties assert that the opposing party has improperly withheld production of
24   documentation pursuant to the attorney-client privilege. The Court will address each
25   party's claims.

26       **1.    Legal Standard.**

27   Federal courts look to state law to determine the applicability of evidentiary
28   privileges to discovery disputes in diversity actions. Fed. R. Evid. 501 ("[I]n a civil case,

state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). In Arizona, the attorney-client privilege is defined by statute. *See* Ariz. Rev. Stat. § 12-2234.[4] For a communication to be protected by the attorney-client privilege, "the communication must be made to or by the lawyer for the purpose of securing or giving legal advice." *Samaritan Foundation v. Goodfarb*, 862 P.2d 870, 874 (1994) (en banc).

"Where legal advice of any kind is sought from a professional legal advisor in his capacity as such, communications relating to that purpose, made in confidence by [a] client are, at his instance[,] permanently protected from disclosure by himself or by the legal advisor, unless the protection be waived." *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (internal numbering omitted). The attorney-client privilege conceals only those communications and advice that the client has a reasonable expectation will remain solely within the knowledge of the client, the attorney, and the necessary agents of each. *Id.* at 212; *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) (finding a client's communication to his attorney was not "made in confidence" where it was made for the

---

[4] Section 12-2234 provides:

> A. In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment. An attorney's paralegal, assistant, secretary, stenographer or clerk shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity.
>
> B. For purposes of subsection A, any communication is privileged between an attorney for a corporation, governmental entity, partnership, business, association or other similar entity or an employer and any employee, agent or member of the entity or employer regarding acts or omissions of or information obtained from the employee, agent or member if the communication is either:
>
> > 1. For the purpose of providing legal advice to the entity or employer or to the employee, agent or member.
> >
> > 2. For the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.
>
> C. The privilege defined in this section shall not be construed to allow the employee to be relieved of a duty to disclose the facts solely because they have been communicated to an attorney.

1   purpose of transmission to outside auditor).

2       Confidentiality must be affirmatively established by the privilege proponent and is

3   not presumed. *See Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th

4   Cir. 1981) ("[T]he burden of proving that the attorney-client privilege applies rests . . . with

5   the party asserting it."); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept.*

6   *Term, 1991*, 33 F.3d 342, 354 (4th Cir. 1994) ("[T]he mere relationship between the

7   attorney and the client does not warrant a presumption of confidentiality."). Additionally,

8   "[t]he attorney-client privilege may extend to communications with third parties who have

9   been engaged to assist the attorney in providing legal advice. If the advice sought is not

10  legal advice, but, for example, accounting advice from an accountant, then the privilege

11  does not exist." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citing *Weil*,

12  647 F.2d at 24). "'What is vital to the privilege is that the communication be made *in*

13  *confidence* for the purpose of obtaining *legal advice from the lawyer*.'" *United States v.*

14  *Gurtner*, 474 F.2d 297, 288-99 (9th Cir. 1973) (emphasis in original) (quoting *United*

15  *States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)).

16      Finally, when the client voluntarily discloses privileged communications to

17  someone outside the attorney-client relationship, the privilege is waived. *Tennenbaum v.*

18  *Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996). The voluntary disclosure of a

19  privileged communication may also destroy the privilege as to other communications

20  relating to the same subject matter that, in fairness, ought to be considered together. *Weil*,

21  647 F.2d at 24; Fed. R. Evid. 502(a).

22          **2.      Plaintiffs' Claims of Attorney Client Privilege.**

23      In the First Joint Notice, Defendants assert three challenges to Plaintiffs' claims of

24  attorney-client privilege: (1) Defendants challenge Plaintiffs' claims of attorney-client

25  privilege for approximately 50 communications with SMIS, the broker Plaintiffs engaged

26  to procure the policies at issue (doc. 60 at 2); (2) Defendants argue that, even if Plaintiffs'

27  communications with SMIS were privileged, "the crime-fraud exception applies" and an

28  *in camera* review of those communications is warranted (*id.* at 2-3); and (3) Defendants

challenge Plaintiffs' claims of attorney-client privilege for documents that "were only carbon copied to in-house counsel in an attempt to protect otherwise non-privileged communications" (*id.* at 3). The Court will address each argument.

## A.   SMIS.

Defendants first argue that Plaintiffs have improperly withheld communications between Plaintiff DLC's in-house counsel, Mr. Holland, and DLC's insurance broker, SMIS, under the attorney-client privilege. (Doc. 66 at 6-8.) Specifically, Defendants allege that these communications took place in the ordinary course of business and thus are not protected. (*Id.*) In response, Plaintiffs argue that Mr. Holland's communications with SMIS were for the purpose of obtaining information that would be used to provide legal advice to DLC, and thus that the communications are covered under the privilege. The Court agrees.

Courts "have long recognized that 'the advocate and counselor [needs] to know all that relates to the client's reasons for seeking representation' if he is to provide effective legal advice." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). Arizona courts interpret the attorney-client privilege as including communications of investigators acting at the direction of the corporation's lawyer, including communications between the investigator and non-employees. *See Salvation Army v. Bryson*, 273 P.3d 656, 662 (Ariz. Ct. App. 2012). *See also United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010) (reasoning that "too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely.").

Here, Plaintiffs have provided a declaration from Mr. Holland averring that the communications with SMIS at issue were "to obtain information for the purpose of developing legal recommendations and strategies in connection with the anticipated litigation with Defendants, and to be able to provide informed and candid advice to Plaintiffs." (Doc. 67-1, Ex. A, at 4-5 ¶16.) Defendants argue that descriptions of Mr.

1   Holland's communications on the Plaintiffs' privilege log contradict Mr. Holland's claim.
2   (*See* Doc. 66 at 7.) Specifically, Defendants argue that Plaintiffs' privilege log Entry 822[5]
3   and Entry 824[6] describe communications that "make[] no sense" if they were created for
4   the purposes Plaintiffs allege. (Doc. 66 at 7.) "It is far more likely that the emails Holland
5   sent on July 19 and 22, 2019, about the structure of the Taymouth Castle deal were for
6   ordinary business purposes associated with the request SMIS made just a few days later to
7   add TCD and the DeJoria Trust as Joint Insureds." (*Id.* at 7-8.)

8       Defendants' argument is not persuasive. As discussed at the hearing, it seems
9   equally plausible that Mr. Holland communicated with SMIS to provide them with
10  information regarding the structure of Taymouth Castle deal and Plaintiffs' corporate
11  organizational structure so that, in return, SMIS could provide Holland with information
12  for the purpose of developing legal recommendations for Plaintiffs. Defendants do not
13  provide any further argument or evidence rebutting Mr. Holland's declaration that the
14  communications at issue were for the purpose of developing legal recommendations and
15  strategies in connection with this anticipated litigation. Accordingly, the Court will deny
16  Defendants' request to compel production of the privileged communications.

17                    **B.      Crime-Fraud Exception.**

18      Defendants next argue that "even if these communications were otherwise
19  privileged, the crime-fraud exception applies under the circumstances." (Doc. 66 at 8.)
20  Arizona "has long recognized a 'crime-fraud' exception to the [attorney-client] privilege."
21  *Kline v. Kline*, 212 P.3d 902, 911 (Ariz. Ct. App. 2009). "[T]he privilege is not extended
22  when there is a prima facie showing that a communication with an attorney was used to
23  perpetuate a crime or fraud." *Id.*

24      "Once the privilege has been established, a party attempting to set it aside under the
25  crime-fraud exception must demonstrate 'a factual basis adequate to support a good faith

---

26  [5] Entry 822 describes an email between Mr. Holland and SMIS for the purpose of
27  "obtaining or providing information in order for counsel to provide legal advice regarding
    Taymouth Castle Structure." (Doc. 66-1, Ex. A, at 269.)
28  [6] Entry 824 describes an email between Mr. Holland and SMIS "for the purpose of
    obtaining or providing information in order for counsel to provide legal advice regarding
    Plaintiffs' corporate and organizational structure. . . ." (Doc. 66-1, Ex. A, at 269.)

belief by a reasonable person' that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Clements v. Bernini in & for Cty. of Pima*, 471 P.3d 645, 649 (Ariz. 2020) (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal citation omitted)).

Here, Defendants argue that Plaintiffs engaged in a fraud by seeking to retroactively add entities to the Policy that had already suffered insurable losses without disclosing those potential losses to BIC. (*See* Doc. 66 at 7-9.) Specifically, Defendants assert that "[t]he timeline of Plaintiffs' actions strongly suggests Plaintiffs realized as they were preparing to submit a proof of loss that the entities that suffered the alleged losses, TCD and the DeJoria Trust, were not named as Joint Insureds under the Policies[.]" (Doc. 66 at 8.) Thus, "Plaintiffs scrambled to have their brokers request an endorsement retroactively adding those entities before disclosing any facts about the losses to BIC[.]" (*Id.* at 8-9.) And Plaintiffs' intentional failure to disclose knowledge that the new entities had already suffered an insurable loss was a material and fraudulent omission in breach of Section C of the "Arizona Changes" Endorsement to the Primary Policy.[7] (Audio Recording of the January 11, 2022 Hearing at 11:13:15-11:14:20.)

Defendants provide the following summarized timeline of relevant events:

---

[7] The "Arizona Changes" Endorsement states:

> We will not pay for any loss or damage in any case involving misrepresentations, omissions, concealment of facts or incorrect statements:
>
> 1. That are fraudulent;
>
> 2. That are material either to the acceptance of the risk or to the hazard assumed by us; and
>
> 3. Where, if the true facts had been made known to us as required either by the application for the Policy or otherwise, we in good faith would either:
>
> > a. Not have issued the Policy;
> >
> > b. Not have issued the Policy in as large an amount; or
> >
> > c. Not have provided coverage with respect to the hazard resulting in the loss.

(*See* Doc. 1-3 at 81.)

| Date | Event |
|---|---|
| March 18, 2019 | First Notice of Potential Claim Provided to Defendants |
| March 29, 2019 | Plaintiffs Begin Drafting Proofs of Loss (See Entry 771). |
| June 20, 2019 | Plaintiffs advise "we are in the process of completing our proof of loss." |
| June 27, 2019 | Plaintiffs request an extension to July 31, 2019 to submit proof of loss |
| July 19, 2019 to July 22, 2019 | Plaintiffs and SMIS exchange emails about "Taymouth Castle Structure," "Plaintiffs' corporate and organizational structure," "corporate formation documents for . . . Taymouth Castle DLC, LLC," and the "insurance claims" (See Entries 822-824). |
| July 26, 2019 | Plaintiffs seek to retroactively add TCD and the DeJoria Trust as Joint Insureds (the first time Plaintiffs ever requested an entity be added retroactively) and ask BIC to "forward us the endorsement on Monday." |
| July 26, 2019 to July 28, 2019 | Plaintiffs and SMIS exchange emails about the insurance claims and a "draft of a proof of loss form" (See Entries 825-828). |
| July 29, 2019 | BIC issues endorsement adding TCD and the DeJoria Trust as Joint Insureds (without knowledge that TCD and the DeJoria Trust had already suffered a loss or that DLC did not have any financial interest in the DeJoria Trust) |
| July 30, 2019 | Plaintiffs submit two proofs of loss seeking coverage for losses allegedly suffered in part by TCD and the DeJoria Trust. |

(Doc. 66 at 9.)

In response, Plaintiffs do not contest Defendants' described timeline of events; instead, Plaintiffs argue that the timing is purely coincidental. (Doc. 67 at 9-10.) Plaintiffs insist that "Mr. Holland did not direct the broker to add TCD to the named insured schedule on or around July 26, 2019 (an action which the broker seems to have taken on its own once it noticed a clerical mistake) and does not recall any conversations related to the additional of TCD as an insured at any time prior to, on, or around July 26, 2019." (*Id.*) Mr. Holland avers to the same in his provided declaration. (*See* Doc. 67-1, Ex. A, at 5 ¶¶17-18.) Plaintiffs' argument is not persuasive.

The Court agrees with Defendants that the timeline of events leading up to Plaintiffs' filing of their two proofs of loss is suspicious and provides at least circumstantial evidence supporting Defendants' claim that the crime-fraud exception applies. Defendants' argument is further bolstered by the fact that it was SMIS who emailed CRC seeking to retroactively update the Policies with new entities. (*See* Doc. 67-1, Ex. B, at 7 (July 26,

2019 email from SMIS[8] to CRC, and forwarded to BIC requesting updated insured entities list retroactive to January 2019).) What is more, despite having sought numerous prior endorsements adding entities to the Policies, this was the first time Plaintiffs had ever requested that an endorsement be made retroactive. (*See* Doc. 66 at 3.)

Plaintiffs present several additional arguments in opposition to Defendants' request for *in camera* review of the documents. First, Plaintiffs argue that Defendants' approval of the added entities was "rubber stamped," requiring no additional underwriting or investigation prior to approval. (Doc. 67 at 8.) But, even if true, that would not disprove Defendants' argument that Plaintiffs intentionally mislead BIC by failing to disclose material information prior to retroactively adding entities that had already suffered an insurable loss. Second, Plaintiffs argue that TCD was only excluded from the policies based on a clerical error and was already covered under the 2019-2020 Policy; thus, Plaintiffs imply that any attempt to correct that error could not have been fraudulent. (*Id.* at 9.) Plaintiffs' argument is not persuasive. It was Plaintiffs who specifically requested the clause in the Policy requiring that each entity to be covered as a named insured under the Policy be detailed via endorsement. The fact that Plaintiffs failed to properly include TCD in a prior endorsement does nothing to show that Plaintiffs did not later fraudulently omit material information from their request that Defendants retroactively add TCD. Plaintiffs also argue that CRC simultaneously sought to update a number of entities across multiple policies, reiterating their claim that the timing was coincidental. (*See* Doc. 67 at 9.) But without review of the documents at issue, the Court is unable to determine whether Plaintiffs may have added those additional entities to create a pretext for the improper addition of TCD. Thus, that argument also fails.

After consideration of the totality of the circumstances surrounding Plaintiffs' request to retroactively add TCD as a named insured, the Court finds that Defendants have

---

[8] Although the initial sender of the email asking CRC to update the named insured list with BIC is redacted in the copy provided by Plaintiffs in Exhibit B (*See* doc. 67-1, Ex. B, at 7), the parties made clear at the hearing that SMIS sent that original email to CRC, which CRC then forwarded to BIC. (*See* Audio Recording of January 11, 2022 Hearing at 11:27:30-11:28:18.)

1  provided adequate evidence to "support a good faith belief by a reasonable person that in
2  camera review of the materials may reveal evidence to establish the claim that the crime-
3  fraud exception applies." *See Clements*, 471 P.3d at 649. Accordingly, the Court will grant
4  Defendants' request, and order Plaintiffs to provide to the Court for *in camera* review
5  unredacted copies of all documents created between January 28, 2019 and July 30, 2019
6  and withheld by Plaintiffs on the basis of attorney-client privilege, as listed in Plaintiffs'
7  privilege log. (*See* Doc. 66-1 at 26-272 (Entry Nos. 105 – 833).)

## C. Carbon Copy Communications.

9  Lastly, Defendants argue that Plaintiffs have improperly withheld internal
10  communications by "simply carbon-copying in-house counsel." (Doc. 66 at 9-10.)
11  Specifically, Defendants "assert that communications in which Jeffrey Holland, DLC's in-
12  house counsel is simply carbon copied or otherwise was not an active participant in the
13  communication are not entitled to attorney client privilege." (*Id.* at 10.) Defendants
14  identify 27 communications listed in Plaintiffs' privilege log on which Mr. Holland is only
15  carbon copied. (*See* Doc. 66-2, Ex. B, at 2.) In the alternative, Defendants ask the Court to
16  review Plaintiffs' communications *in camera* to verify their attorney-client privilege
17  claims. (Doc. 66 at 10.)

18  The parties do not dispute that Plaintiff DLC's in-house counsel, Mr. Holland, is
19  only carbon copied on the communications at issue. (*See* Doc. 66-2, Ex. B, at 2.) Courts
20  have held that "merely copying or 'cc-ing' legal counsel, in and of itself, is not enough to
21  trigger the attorney-client privilege." *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 630 (D.
22  Nev. 2013). However, it is well established that "the privilege protects from disclosure
23  communications among corporate employees that reflect advice rendered by counsel to the
24  corporation." *See Miller v. Arizona Pub. Serv. Co.*, No. CV-19-03397-PHX-DWL, 2020
25  WL 5880143, at *2 (D. Ariz. Oct. 2, 2020) (quoting *Bank Brussels Lambert v. Credit
26  Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995) (citations and internal
27  quotation marks omitted)). "A privileged communication should not lose its protection if
28  an executive relays legal advice to another who shares responsibility for the subject matter

underlying the consultation. This follows from the recognition that since the decision-making power of the corporate client may be diffused among several employees, the dissemination of confidential communications to such persons does not defeat the privilege.'" *Id.*

Here, the privilege log entries referenced by Defendants state that the DLC employees involved in the communications were corresponding in a manner that "provided, requested or reflected legal advice" from Mr. Holland regarding various issues. (*See* Doc. 66-1, Ex. A, at 16, 20-23, 25, 46, 54,67-68, 117, 228, 250.) What is more, Mr. Holland avers in his declaration that "[w]hen providing legal advice to Plaintiffs, I routinely obtain information from DLC employees and DLC's agents and I am regularly carbon copied on emails seeking, requesting or reflecting my legal advice regarding various issues." (Doc. 67-1 at 3 ¶6.) Defendants present no evidence, save for Mr. Holland's passive participation in the communications, showing that these documents were not created for the purpose of providing or relaying Mr. Holland's legal advice. (*See* Doc. 66.)

After review of the privilege log and the entries at issue, the Court finds that Plaintiffs have met their burden to show the withheld documents are subject to attorney-client privilege. Additionally, the Court finds that Defendants have failed to show that the Court should exercise its discretion to conduct an *in camera* review of the documents at issue in this subsection. *See In re Grand Jury Investigation*, 974 F.2d at 1075 (a party requesting *in camera* review of assertedly privileged documents must show "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged."). *See also Miller*, 2020 WL 5880143 *3 (D. Ariz. 2020) ("The requesting party must show more than a 'hunch' that the privilege claim is unfounded."). *Cf. Reynolds v. Liberty Mut. Ins. Co.*, 2017 WL 6415360, *4 (D. Ariz. 2017) (party seeking *in camera* review "failed to make the requisite factual showing, instead hinging his argument on a hunch").

Accordingly, the Court will deny Defendants' request to compel production of the carbon copied communications, and decline to review those documents *in camera* based

1   on Defendants arguments in this section.[9]

2   ### 3.    Defendants' Claims of Attorney Client Privilege.

3   In the Second Joint Notice, Plaintiffs seek a court order compelling Defendants to

4   produce documents previously withheld pursuant to the attorney-client privilege. (Doc.

5   65.) Specifically, Plaintiffs allege that Defendants have improperly withheld 299 individual

6   communications created by Mr. Joe Oliva, whom Plaintiffs assert "was retained to assist

7   [BIC] with performing its ordinary business activities related to Plaintiffs' insurance

8   claims[.]" (Doc. 72 at 4-7.) In response, Defendants argue that "BIC retained Oliva as

9   coverage counsel to provide legal advice to BIC on potential coverage issues related to

10  Plaintiffs' claims." (Doc. 74 at 3-7.)

11  As discussed above, for a communication to be protected by the attorney-client

12  privilege, "the communication must be made to or by the lawyer for the purpose of securing

13  or giving legal advice." *Samaritan Foundation*, 862 P.2d at 874. Here, Defendants have

14  provided sworn declarations from both Mr. Oliva (doc. 74-2) and Ms. Megan Manogue,

15  Vice President and Chief Claim Officer for Berkley Financial Specialists, a division of BIC

16  (doc. 74-1). Both Mr. Oliva and Ms. Manogue aver that Mr. Oliva was hired by BIC as

17  coverage counsel in this matter, not to investigate Plaintiffs' claim or to act as a claims

18  adjuster. (*See id.* ("Mr. Oliva was not retained by BIC to 'investigate' Plaintiffs' claim, to

19  act as a claims adjuster, or to make the final coverage determination under the Policy. . . .

20  Mr. Oliva's role as coverage counsel to BIC on this matter involved analyzing the

21  information and documents provided by Plaintiffs, obtaining additional information from

22  Plaintiffs necessary to provide a legal opinion to BIC, and providing a legal opinion to

23  BIC."); Doc. 74-2 ("I was retained by BIC in August of 2019 as legal counsel to provide

24  BIC with legal advice related to claims submitted by [DLC], one of the plaintiffs in this

25  action. More specifically, I was retained to provide BIC with a legal opinion on whether

26  DLC's claim implicated coverage under a commercial crime policy BIC issued to

27  _____

28  [9] The Court notes that some of the communications at issue overlap with those documents ordered to be produced by Plaintiffs for *in camera* review under the crime-fraud exception. Plaintiffs will still be obligated to produce those overlapping documents to the Court.

1  DLC[.]").)

2      Defendants have also created a privilege log. (Doc. 72-1.) Therein, Defendants have

3  provided descriptions of approximately 69 privileged "documents." (*See id.* at 2-24.) Some

4  of the documents include multiple emails. (*See, e.g.*, *id.* at 2-3 (document 2 – listing eight

5  emails exchanged between Sarah Gurka and Mr. Oliva.).) Defendants include a description

6  of each "document," detailing why that document is subject to the privilege. (*Id.* at 2-24.)

7  Review of the log shows that each description alleges the purpose of that communication

8  was either to assist Mr. Oliva with obtaining information to provide legal analysis, or

9  conveying Mr. Oliva's legal advice. (*Id.*) Many of the listed communications include

10 Defendant GAIC's counsel, Mr. Michael Graziano. (*See id.* at 6-7, 10-12.)

11     Contrary to Defendants' provided declarations and privilege log, Plaintiffs argue

12 that Mr. Oliva was in fact a claim adjuster, and thus contend that his communications are

13 not protected by attorney-client privilege. In support of their position, Plaintiffs' assert that

14 BIC Senior Claim Specialist Sarah Gurka, J.D., told Plaintiffs Mr. Oliva was retained to

15 assist with the investigation because of BIC's lack of manpower. (Doc. 72 at 5.) Plaintiffs

16 assert that Mr. Oliva similarly told them that BIC liked to get counsel involved on large

17 claims "because they really don't have time to, to look at them in depth." (*Id.*) Additionally,

18 Plaintiffs argue that Mr. Oliva appears to be the only person who reviewed letters and

19 documents Plaintiffs submitted for investigation of the claim. (*Id.* at 5-9.) Plaintiffs'

20 arguments are not persuasive. Ms. Gurka's informal comments cannot be considered

21 binding as to the role of Mr. Oliva. Particularly when Mr. Oliva himself informed Plaintiffs

22 that he had been retained as coverage counsel. (*See* Doc. 72-3 at 14.) And any argument

23 that Defendants failed to properly investigate or review Plaintiffs' claims does not

24 overcome Ms. Manogue's and Mr. Oliva's sworn declarations detailing Mr. Oliva's role

25 and responsibilities.

26     Plaintiffs also argue that "[r]egardless of whether Mr. Oliva and Goldberg Segalla

27 were retained as coverage counsel by [BIC], Mr. Oliva in fact acted (at least at times) as a

28 claim handler in connection with Plaintiffs' claims. (Doc. 72 at 7.) Thus, Plaintiffs'

contend, Mr. Oliva's communications in his role as a claim handler are not protected. (*See id.* (citing *Nerdig v. Elec. Ins. Co.*, No. CV-17-01859-PHX-GMS, 2018 WL 5776523, at *2 (D. Ariz. Nov. 1, 2018) ("[M]erely assigning an attorney to perform an ordinary insurance business function does not "cloak with privilege matters that would otherwise be discoverable.")).) Plaintiffs' argument fails. Unlike in *Nerdig*, where the court found that claim notes were not protected by the attorney-client privilege when a defendant insurance company used outside counsel to assist with claims adjudication and admitted that the claim notes did not contain legal advice (*see Nerdig*, 2018 WL 5776523, at *1-2); here, Defendants have provided a detailed description for each communication at issue asserting that it either included Mr. Oliva's legal analysis and advice, or sought information from Defendants to assist with developing that legal analysis and advice (*See* doc. 72-1).

Based on the Court's discussion with parties at the hearing, and the Court's review of the record, the Court finds that Mr. Oliva was retained as coverage counsel for BIC to provide legal advice on Plaintiffs' claims, and that Defendants have provided sufficient support for their claims that Mr. Oliva's communications at issue are subject to the attorney-client privilege. To the extent Plaintiffs seek to compel disclosure of the communications listed in Defendants' privilege log (doc. 72-1), Plaintiffs have failed to show Mr. Oliva was acting outside his capacity of coverage counsel or that Mr. Oliva's communications were in the ordinary course of business.

Accordingly, the Court will deny Plaintiffs' request to compel disclosure of Mr. Oliva's privileged communications. The Court further finds that Plaintiffs have not shown that a good faith basis exists to believe that the communications are not privileged. Therefore, the Court will decline to require an *in camera* review.

**IV.   Conclusion.**

In summary, the Court finds that both party's claims regarding the date that they anticipated litigation in this action – March 2019 for Plaintiffs, and April 2, 2020 for Defendants – are reasonable, and the Court will not compel production of documents withheld under a work product designation following those dates.

1    The Court further finds that both SMIS's and Mr. Olvia's communications at issue
2   are protected under the attorney-client privilege. Similarly, the Court finds that emails in
3   which Mr. Holland was carbon-copied were properly withheld under the attorney-client
4   privilege. However, pursuant to the crime-fraud exception, the Court will conduct an *in*
5   *camera* review all communications listed in Plaintiffs' privilege log with dates between
6   January 28, 2019 and July 30, 2019 (doc. 66-1 at 26–272 (Entry Nos. 105-832)). After
7   review of the unredacted documents, the Court will issue an order directing Plaintiffs what
8   specific documents, if any, they must disclose to Defendants.

9    Accordingly

10   **IT IS ORDERED**:

11    1.    Defendants' Request to Compel Production of Discovery (docs. 60, 66) is
12   **granted in part** to the extent provided in this Order.

13    2.    On or before **February 4, 2022**, Plaintiffs shall provide to the Court for *in*
14   *camera* review unredacted copies of all documents created between January 28, 2019 and
15   July 30, 2019 and withheld by Plaintiffs on the basis of attorney-client privilege, as listed
16   in Plaintiffs' privilege log. (*See* Doc. 66-1 at 26-272 (Entry Nos. 105 – 833).)

17    3.    Plaintiffs' Request to Compel Production of Discovery (docs. 65, 72) is
18   **denied**.

19    Dated this 21st day of January, 2022.

Honorable John Z. Boyle
United States Magistrate Judge

- 25 -