Ryan J. Lorenz (SBN 019878)
**CLARK HILL PLC**
14850 N. Scottsdale Road, Suite 500
Scottsdale, AZ 85254
Telephone: (480) 684-1107
rlorenz@clarkhill.com

Michael Keeley, Texas Bar No. 11157800 (*Admitted Pro Hac Vice*)
J. Caralisa Connell, Tennessee Bar No. 036298 (*Admitted Pro Hac Vice*)
**CLARK HILL PLC**
901 Main Street, Suite 6000
Dallas, TX 75202
Telephone: (214) 651-4718
mkeeley@clarkhill.com
cconnell@clarkhill.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Discovery Land Company, LLC; Discovery Land Enterprises, LLC; and Taymouth Castle DLC, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Berkley Insurance Company; and Great American Insurance Company, <br><br> Defendants. | No. 2:20-cv-01541-JJT <br><br> **DEFENDANT/COUNTER-PLAINTIFF BERKLEY INSURANCE COMPANY'S MOTION AND MEMORANDUM FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS** |

Under Fed. R. Civ. P. 56, Defendant Berkley Insurance Company ("BIC"), submits this Memorandum in Support of its Motion for Partial Summary Judgment Against Discovery Land Company, LLC ("DLC"), Discovery Land Enterprises, LLC ("DLE"), and Taymouth Castle DLC, LLC ("TCD") ("Plaintiffs").[1]

## I.     INTRODUCTION

This is a first-party insurance coverage case built on Plaintiffs' disingenuous efforts to

---

[1] In support of this motion, BIC is filing the Declaration of Michael Keeley, which attaches BIC's summary judgment evidence. Exhibits to the Declaration will be cited as "Ex. ___." Deposition testimony will be cited by deponent and page and line, such as "DLC Depo ___/___" or "Joyner Depo ___/___." Additionally, references to BIC's Statement of Undisputed Material Facts will be cited as "SOF ¶ __."

fit a square peg into a round hole. Plaintiffs seek $17,500,000 in connection with two related claims under a commercial crime policy BIC issued to DLC (the "Policy"): $12,754,185 under the Employee Theft Insuring Agreement and the Outside the Premises Insuring Agreement (theft by a messenger) for funds allegedly stolen by Stephen David Jones ("Jones"), the U.K. solicitor who assisted DLC with the purchase of Taymouth Castle in Scotland (the "Castle"); and $4,837,400 under the Forgery and Alteration Insuring Agreement for losses allegedly resulting from a forged loan application related to the Castle.

Plaintiffs' alleged losses are not covered for four main reasons. *First*, there is no coverage under the Employee Theft Insuring Agreement because Jones was Plaintiffs' lawyer, not their "employee." *Second*, there is no coverage under the Outside the Premises Insuring Agreement because Jirehouse was the law firm they hired, not a "messenger" transporting their money. *Third*, there is no coverage under the Forgery or Alteration Insuring Agreement because the allegedly forged loan application is not the type of document covered by the Policy and did not cause a direct loss of covered property.  *Fourth*, various Policy exclusions bar coverage. Finally, Plaintiffs' claims for bad-faith fail because BIC's coverage determination was reasonable and Plaintiffs incurred no damage from BIC's actions.[2]

## II.   SUMMARY OF FACTUAL BACKGROUND

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ Ex. 20 (First SIHK Affidavit ¶¶ 11-18). ██████

██████████████████████████████████████████████████████

---

[2] BIC also incorporates the arguments raised in Great American's motion for summary judgment to the extent they are applicable to BIC and the Policy as well as the facts and evidence in support of such arguments, but does not repeat them there. BIC specifically incorporates Great American's arguments regarding the known loss doctrine, The River Tay Castle, LLP ("RTC") not being a joint insured, and Plaintiffs' alleged losses constituting a single "occurrence" under the Policy.

████████████████████████████████████████████████████████████

████████████████████████████████████████████ (SOF ¶¶ 15, 23).

**A.**     **The First Claim – The Alleged Theft of Funds by Jones**

████████████████████████████████████████████

████████████████████████████████████████████████████████████

(SOF ¶¶ 15-19). ████████████████████████████████████

████████████████████████████████████████ (SOF ¶¶ 20-21). Jones recommended DLC use a U.K. company associated with Jirehouse, Esquiline Asset Managers Limited ("EAML"), rather than having TCD purchase the Castle directly. Under this arrangement, EAML would purchase the Castle and then sell it to RTC, a U.K. company created solely to own the Castle. (SOF ¶ 22).

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ (SOF ¶ 23).

Jirehouse paid a portion of the TCD Funds to the seller as a deposit. (SOF ¶ 24). ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ (SOF ¶¶ 25-26). On December 6, 2018, Jirehouse informed DLC that Jirehouse could not use the TCD Funds or the November Funds to close the purchase due to money laundering and compliance concerns, and that in order to close timely, DLC needed to wire an additional $9,300,000 to Jirehouse and confirm the funds belonged to DLC. (SOF ¶¶ 27-28). ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (SOF ¶¶ 28-30). ████████████████

██████████████████████████████████████████████████ (SOF ¶ 31).

**B.** **The Second Claim – The Forged Loan Application**

On Jirehouse's recommendation, ████████████████████████

██████████████████████████████████████████████████████

█████████████████████████ (SOF ¶¶ 32-33). ██████████████

███████████████████████████████████████ ███████

██████████████████████████████████████████████████████

████████████████████████████████[3] (SOF ¶¶ 36). █████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

(SOF ¶ 38). Approximately £4,980,479 was drawn down by Jones and Clark, and some of those funds were unlawfully transferred to third parties. (SOF ¶ 40). On March 6, 2019, RTC defaulted on its interest payments, and Dragonfly demanded immediate payment. (SOF ¶ 41).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████ (SOF ¶ 41). ████████████████ ████████████████████

████████████████████ (SOF ¶ 43).

### III.   ARGUMENT AND AUTHORITIES

**A.** **There Is No Coverage Under The Employee Theft Insuring Agreement Because Jones Is Not An "Employee," As Defined By The Policy**

Plaintiffs seek coverage under the Employee Theft Insuring Agreement of the Policy, but their claim is preposterous because Jones acted as their outside lawyer, not an "employee."

---

[3] Octopus Property ("Octopus") is the parent company of Dragonfly.

[4] It is unclear which entity Plaintiffs contend funded the settlement. Plaintiffs' Amended Complaint states that TCD paid the amounts to Dragonfly, while their interrogatory responses say "DLC/DLE" and "Plaintiffs." But, as discussed below, which entity made the payment is irrelevant because payment by any of the Plaintiffs is not covered under the Policy.

Plaintiffs argue Jones was an employee under Definition 7.a.(1) of the Policy, which requires: (1) Jones was in Plaintiffs' service; (2) Plaintiffs compensated Jones **directly** by salary, wages or commissions; and (3) Plaintiffs had the right to direct and control Jones while he performed services for them. (SOF ¶¶ 5, 84). None of these requirements are met here. Further, the definition of employee has a carveout for "any agent . . . independent contractor or representative of the same general character . . . ." (SOF ¶ 6). Jones was clearly Plaintiffs' agent and acted as an independent contractor.

### 1. Plaintiffs Did Not Compensate Jones Directly by Salary, Wages or Commissions

Plaintiffs admit they did not hire Jones as an employee in the normal course, but instead argue Jones was an employee because they paid Jirehouse legal fees, along with value added tax required by U.K. law, and Jirehouse in turn paid Jones as a lawyer working for Jirehouse. (SOF ¶ 84). ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(SOF ¶¶ 46-47). As such, all such payments were neither direct, nor salary, wages or commissions.

The term direct is not ambiguous. It means "straight, undeviating … immediate." *Direct,* Black's Law Dictionary (11th ed. 2019). The Ninth Circuit has held "direct means direct," or immediate. *Vons Cos. v. Fed. Ins. Co.*, 213 F.3d 489, 492 (9th Cir. 2000). *See also Univ'l Mortg. Corp. v. Wurttembergische Versicherung AG*, 651 F.3d 759,762 (7th Cir. 2011) (following "direct-means-direct" approach and identifying *Vons* as the seminal "direct-means-direct" case); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622,629 (5th Cir. 1998); *Oriental Fin. Group, Inc. v. Fed. Ins. Co.*, 598 F.Supp.2d 199,208 (D.P.R. 2008); *Direct Mortg. Corp. v. National Union Fire Ins. Co.*, 625 F.Supp.2d 1171, 1176 (D. Utah 2008); *Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co.*, No. CV305-167, 2007 WL 4973847, at*3-5 (S.D. Ga. Sept. 14, 2007); *Fireman's Fund Ins. Co. v. Spec. Olympics Int'l Inc.*, 249 F. Supp.2d

19,26-28 (D. Mass.2003), *aff'd*, 346 F.3d 259 (1st Cir.2003); *Finkel v. St. Paul Fire & Marine Ins. Co.*, No. 3:00CV1194, 2002 WL 1359672, *3 (D. Conn. June 6, 2002); *Patrick v. St. Paul Fire & Marine Ins. Co.*, No. Civ. 1:99CV314, 2001 WL 828251,*3 (D. Vt. Feb. 15, 2001); *Abady v. Certain Underwriters at Lloyd's London Subscribing to Mortg. Bankers Bond-No. MBB-06-0009*, 317 P.3d 1248,1253 (Colo. App. 2012); *Cargill, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. A03-187, 2004 WL 51671,*12 (Minn. Ct. App. Jan. 14, 2004)); *RBC Mortg. Co. v. Nat'l Union*, 812 N.E.2d 728, 736-37 (Ill.App.3d 2004); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617,627 (Wis. Ct. App. 2003); *City of Burlington v. W. Sur. Co.*, 599 N.W.2d 469,472 (Iowa 1999).

In interpreting an almost identical definition of employee, the U.S. District Court in Kansas held a wrongdoer was not "compensate[d] directly" as required by the employee theft policy when his paycheck was received from the parent corporation rather than the wholly-owned subsidiary who suffered the loss. *T.S.I. Holdings, Inc. v. Buckingham*, 885 F.Supp. 1457, 1464 (D. Kan. 1995). The court reasoned the meaning of the word "direct" meant the payments were "without divergence from the source," or "without any intervening agency or instrumentality. . . Simply, under the plain and ordinary meaning of the term, [the wrongdoer] was compensated directly by [the parent corporation], not [the subsidiary suffering the loss]. To determine otherwise would require an unreasonable and illogical construction of the Policy language." *Id.* at 1464; *see Piles Chevrolet Pontiac Buick, Inc. v. Auto-Owners Ins. Co.*, No. 2011-CA-002317-MR, 2013 WL 2120319, at *3 (Ky. Ct. App. May 17, 2013) (wrongdoer not employee under policy where, although she performed work for insured, she was paid by and under the control of an unrelated company ); *see also Chancey v. Cincinnati Ins. Cos.*, No. 1:12-CV-679-WKW, 2013 WL 1908387, at *2-3 (M.D. Ala. May 7, 2013). Here, Plaintiffs admit all payments to Jones went through Jirehouse. (SOF ¶¶ 46-47). Even assuming Jirehouse used those precise funds to pay Jones, which has not been proven, that payment was certainly

not a direct payment from Plaintiffs. Rather, there were multiple intervening steps: (1) Plaintiffs transferred money to Jirehouse; (2) Jirehouse performed legal services; (3) Jirehouse charged Plaintiffs for work performed; (4) Jirehouse withdrew the amount of its charged fees from the money receive; (5) Jirehouse transferred the money to its general account; and finally (6) Jirehouse made payment to Jones and others. Thus, Plaintiffs' payments to Jirehouse do not meet the "direct" requirement of the above definition of employee.

Additionally, ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████ (SOF ¶ 48). The Arizona Supreme Court has defined the term salary as "fixed compensation paid regularly (as by the year, quarter, month, or week) for services." *Wade v. Az. Retirement System*, 390 P.3d 399, 802 (Ariz. 2017). Wages have similarly been defined by the Arizona Supreme Court. *Amer. Fed. of State Cty. and Municipal Emp. AFL-CIO Local 2384 v. City of Phoenix*, 466 P.3d 1158, 1162 (Ariz. 2020). And, Black's Law Dictionary defines "commission" as "a fee paid to an agent or employee for a particular transaction, as a percentage of the money received from the transaction." Commission, Black's Law Dictionary (11th ed. 2019); *see also* Ariz. Rev. Stat. § 44-1798 (2020) ("commission" means "(a) Compensation accruing to a sales representative for payment by a principal the rate of which is expressed as percentage of the dollar amount of orders or sales…"). ████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████ (SOF ¶¶ 45,49-51). ███████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

(SOF ¶ 53). ██████████████████████████████████████████ (SOF ¶

57). ███████████████████████████████████

███████████████████████████████████████

(SOF ¶¶ 45-57). Therefore, Jones was not Plaintiffs' employee.

### 2.    Plaintiffs Did Not Have the Right to Direct and Control Jones and Jones Was Not in Their Service

Courts interpreting similar provisions look to state law, including workers' compensation law and independent contractor law, in determining whether an insured's purported right to direct and control an individual is enough to meet the definition of "employee." *See Cedar Lake Homeowners Ass'n v. Northwest Empire Cmty. Mgmt.*, No. 3:14-CV-00599-PK, 2015 WL 5970481, at *5 (D. Or. Oct. 13, 2015); *N.S. Co., Inc. v. Cincinnati Ins. Co.*, 416 S.E.2d 859, 860 (Ga. Ct. App. 1992). Under Arizona law, "[t]he 'right to control' a worker's activities must be exercised within the context of an ongoing and integral business process before the worker will be deemed an employee." *Anton v. Indus. Comm'n of Ariz.*, 688 P.2d 192, 197 (Ariz. Ct. App. 1984). Arizona courts consider these factors in determining whether a worker is considered an employee: (1) the duration of employment; (2) the method of payment; (3) who furnishes necessary equipment and place of work; (4) the right to hire, fire, and discipline; (5) who bears responsibility for insurance; (6) how much the employer may exercise control over the details of the work and the degree of supervision; (7) the specialization or skill involved in such business; (8) whether the work was performed in the usual and regular course of the employer's business; and (9) the belief of the parties. *Home Ins. Co. v. Indus. Comm'n*, 599 P.2d 801, 803 (Ariz. 1979); *see also Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1189-90 (9th Cir. 2002); *Adam v. Am. Family Mut. Ins. Co.*, 185 F.3d 865 (Table) (9th Cir. 1999); *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 142 (Ariz. 1990); *Anton*, 688 P.2d at 197.[5] "No one factor is in itself controlling, so a court

---

[5] Arizona courts also consider other relevant facts such as the terms of the parties' contract as well as the withholding from wages of state and federal income tax, social security payments,

must consider the totality of the circumstances." *Juarez v. CC Servs., Inc.*, 434 F.Supp. 2d 755, 760 (Ariz. 2006). "The court's ultimate focus is on whether, as a matter of economic reality, the individual is dependent upon the business to which she renders service." *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1299369, at *2 (D. Ariz. Mar. 23, 2015).

Under these factors, it is clear Plaintiffs' did not have the right to direct and control Jirehouse or Jones. *First*, ███████████████████████████████████████████ ███████████████████████████ ██████████████████████████████ ████████████████████████████████████████████████████████████████ ███████ (SOF ¶¶ 58-59). *Second*, ██████████████████████████████████[6] (SOF ¶ 49-50). *Third*, ███████████████████████████████████████ (SOF ¶ 60). *Fourth*, while Plaintiffs may have had the right to terminate its relationship with Jirehouse, Plaintiffs did not have a right to "fire" Jones from his employment with Jirehouse. (SOF ¶ 61). *Fifth*, ██████████████████████████████████████████████████████████ ███████████████████████████ (SOF ¶¶ 62-63). *Sixth*, Plaintiffs exercised very little control and supervision over the details of Jones' work. █████████████████████████ █████████████████████████████████████████████[7] (SOF ¶ 65). *Seventh*,

---

and worker compensation premiums. *Moreland v. Barrette*, No. CV 05-480 TUC DCB, 2007 WL 9724326, at *3 (D. Ariz. Mar. 27, 2007). Plaintiffs also did not withhold income taxes, social security payments, or worker compensation premiums from any "payments" to Jirehouse. Nor did Plaintiffs provide Jones with a pension under the U.K. pension act. Plaintiffs did not even receive invoices (nonetheless invoices detailing any charges) from Jirehouse. (SOF ¶¶ 49, 52, 63-64).

[6] *See Juarez*, 434 F.Supp. 2d at 762 ("[R]egular payment of a set salary weighs in favor of an employer-employee relationship but [employer's] failure to withhold taxes weighs in favor of the opposite conclusion.").

[7] *Santorii v. MartinezRusso, LLC*, 381 P.3d 248, 253 (Ariz. 2016) ("The right to control is not established when the entity cannot control the worker's time or the method and means of how the work is completed."); *Dania v. Indus. Comm'nl*, 434 P.3d 592, 595 (Ariz. App. 2019) (finding lack of control where the individual controlled his own hours, driving schedule, was not subject to regular AAA performance reviews, and kept his fares and tips and paid his own

█████████████████████████████████████████████████

██████████████████████████████████ (SOF ¶¶ 66, 68). *Eighth*, ████

█████████████████████████████████████████████████

████████████████████████████████████ (SOF ¶ 68). *Ninth*,

█████████████████████████████████████████████████

████████████████████████[8] To the contrary, the language in the engagement letters confirm Plaintiffs' considered themselves Jirehouse's "client" not employer.[9] (SOF ¶ 69). Based on the totality of these circumstances, Plaintiffs did not have the right to direct and control Jirehouse and in turn, did not have the right to direct and control Jones.

### 3.    Jones Was Not an Employee Because He Was Plaintiffs' Agent and Independent Contractor

The Arizona Supreme Court, sitting *en banc*, has held "[l]awyers are agents of their clients, but they are not their employees," and has noted attorneys are independent contractors. *Wiggs*, 10 P.3d at 628; *see also Eling v. Jones*, 797 F.2d 697, 699 (8th Cir. 1986); *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 376 (2d Cir. 1975); *Brinkley v. Farmers Elevator Mut. Ins. Co.*, 485 F.2d 1283, 1286 (10th Cir. 1973); *AKH Co., Inc. v.*

---

taxes."); *see also Wiggs v. City of Phoenix*, 10 P.3d 625, 628 (Ariz. 2000) (noting in a principal-independent contractor relationship, the principal instructs the independent contractor on what to do, but not how to do it).

[8] ███████████████████████████████████████████████ Ex. 11 (DLC Depo, Vol. II, 228/17-229/1).

[9] *See Marin v. USCORP*, No. CIV 07-048-TUC-CKJ, 2008 WL 11441991, at *5 (D. Ariz. Aug. 18, 2008) ("[W]here an individual is free to pursue entrepreneurial activities outside of his association of the principal in question, the individual is likely an independent contractor.").

█████████████████████████████████████████████████

*Universal Underwriters Ins. Co.*, 428 F.Supp. 3d 536, 580 (D. Kan. 2019); *Devine v. Judge Law Firm, ALC*, No. 16-CV-02999-AJB-MDD, 2017 WL 3118777, at *5 (S.D. Cal. July 21, 2017); *Sille v. Parball Corp.*, No. 2:07-CV-00901-KJD, 2014 WL 2565674, at *2 (D. Nev. June 6, 2014); *Oei v. N. Star Capital Acquisitions, LLC*, 486 F.Supp.2d 1089, 1095 (C.D. Cal. 2006); *In re Berry Pub. Servs., Inc.*, 231 B.R. 676, 682 (N.D. Ill. Bankr. 1999); *Andrews & Lawrence Prof's Servs., LLC v. Mills*, 223 A.3d 947, 970 (Md. 2020). The Third Circuit has reasoned "[i]t is clear that attorneys exercise exclusive control of the manner of performing their legal work, being responsible to the client only for the result." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853 (3d Cir. 1996). "[W]hen attorneys act pursuant to the exercise of independent professional judgment, they possess such considerable autonomy over the details and manner of performing their work that they are presumptively independent contractors[.]" *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 278-79 (Ill. 2004) (emphasis added).

While the engagement letters reference "Specific Instructions" for Jirehouse to follow, no actual "Specific Instructions" were included. (SOF ¶¶ 16-17). Rather, Jirehouse was left to determine on its own how best to represent Plaintiffs, including purchasing the Castle, purchasing fractional interests related to the Castle, purchasing the design and development rights related to the Castle, and structuring the Castle "in the most tax efficient way in accordance with the tax laws and regulations of the United Kingdom." (SOF ¶ 19). The engagement letters reflect an agreement between outside attorneys and their client, and are consistent with the reasons why clients hire outside attorneys, including because clients "are unfamiliar with the law and unable to perform the work themselves." *Horwitz*, 816 N.E.2d at 278-79; *see also Channel Lumber Co., Inc. v. Porter Simon*, 93 Cal. Rptr. 2d 482, 487-88 (Cal. 3d App. 2000). Additionally, the Engagement Letters expressly provide Jirehouse could refuse Plaintiffs' instructions: Jirehouse "may refuse to act on your instructions with respect to any funds in your client account where we believe that your account may be used for any purpose

which is illegal and unlawful, without any obligation on our part to give you any reason and/or explanation for our action and/or inaction (as the case may be)." (SOF ¶ 18).

Plaintiffs hired Jirehouse. ███████████████████████████████████ ██████████████████ (SOF ¶¶ 15, 20-21). ████████████████████████████████ ███████████████████████████ (SOF ¶ 70). How can an entity who hires a law firm to provide legal services claim the law firm's employees are its own? The answer is simple: it cannot without reaching the absurd result that the lawyer is also an employee of each of its clients. Jones was not an "employee" under the Policy and therefore his actions are not covered under the Employee Theft Insuring Agreement.

**B.    There Is No Coverage Under the Outside The Premises Insuring Agreement Because Jirehouse Is Not DLC's "Partner" and Is Therefore Not A "Messenger," as Defined by The Policy**

Plaintiffs also seek coverage for the amounts Jones stole under sub-part (a) of the Outside the Premises Insuring Agreement, which provides that BIC will pay for: "[l]oss of 'money' . . . outside the 'premises' in the care and custody of a 'messenger' or an armored motor vehicle company resulting directly from 'theft', disappearance or destruction." (SOF ¶ 7). The Policy defines "messenger" as: "you, or your relative, or any of your partners or 'members', or any 'employee' while having care and custody of property outside the 'premises.'" (SOF ¶ 8). ██████████████████████████████████ ███████████████████████████████ (SOF ¶ 85). One again, this argument strains credulity. This Insuring Agreement is clear, providing coverage when money is given to a messenger or armored car company to transport, and along the way, it was stolen. That is not what occurred her. ████████████████████████████████████████ ████████ (SOF ¶¶ 23, 31). ██████████████████████████████ (SOF ¶¶ 15, 44, 67, 69).

## 1.     Jirehouse Was Not a "Messenger" as Defined by the Policy

Under the interpretative doctrine of *noscitur a sociis*, the meaning of a word or phrase can be determined "by the company it keeps." *Gonzalez v. State of Arizona*, 435 F.Supp.2d 997, 1002 (D. Ariz. 2006) (quoting *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995)). The Policy's definition of messenger includes "partner" as one of the enumerated persons who may constitute a messenger. (SOF ¶ 8). In the definition of "messenger," the word partner is used in a grammatical set-off stating: "any of your partners or 'members.'" (*Id.*). While the word partner is not defined in the Policy, its accompaniment "member" is defined as: "an owner of a limited liability company represented by its membership interest who, if a natural person, may also serve as a 'manager.'" (SOF ¶ 9). The term "partner" appears in the Policy eighteen times. All eighteen times, partner is used alongside either, or both, member (as it is in the definition of messenger), or "manager," which is defined as "a natural person serving in a directorial capacity for a limited liability company." (SOF ¶ 10). Thus, the context implies "partner" is meant to be an owner of a business partnership or limited partnership.[10]

This interpretation aligns with Black's Law Dictionary's definition of "partner": "One of two or more persons who jointly own and carry on a business for profit. . . ." *Partner*, Black's Law Dictionary (11th ed. 2019); *see Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 349 F. Supp.3d 468, 478 (W.D. Pa. 2018) ("[a] partner is … one of two or more persons who jointly own and carry on a business for profit. . ."); *State v. Van Huizen*, 435 P.3d 202, 208 (Utah 2019) ("the terms 'officer, director, general partner, managing member, or trustee' suggest positions within a private entity or corporate structure."); *see also Abelein v. United States*, 323 F.3d 1210, 1214, n.2 (9th Cir. 2003) ("the "term 'partner' means (A) a partner in the partnership, and (B) any other person whose income tax liability . . . in part by

---

[10] Notably, different law firms use the terms "partner" and "member" interchangeably to denote attorneys who have ownership interest in the firm. For example, Jones executed the engagement letters as a "partner" of Jirehouse. (SOF ¶¶ 16-20).

taking into account . . . partnership items of the partnership.").

Jirehouse was not Plaintiffs' "partner." ███████████████████████████████ (SOF ¶¶ 15-19, 44, 48, 66-68). ███████████████████████████████████████████████████████████████ (SOF ¶ 67). ███████████████████████████████████████████ (SOF ¶ 47, 57, 67). Thus, Jirehouse is not Plaintiffs' "partner" and, therefore, is not a "messenger."

### 2.   Plaintiffs' Loss Is Excluded Under Exclusion D.1.a.

Even if the term partner is construed to include Jones, Plaintiffs' claim is excluded by Exclusion D.1a. of the Policy, which expressly provides the Policy does not cover "Loss resulting from 'theft' or any other dishonest act committed by (1) You; or (2) Any of your partners or 'members'; whether acting alone or in collusion with other persons." (SOF ¶ 11). If Jirehouse and Jones were Plaintiffs' "partners" for purposes of coverage, they must also be "partners" under this Exclusion. *United States v. Lopez*, 998 F.3d 431, 437 (9th Cir. 2021) ("The canon of consistent usage requires a court to presume that 'a given term is used to mean the same thing throughout a statute'").

### 3.   The Stolen Funds Were Not In The "Care And Custody" of Jirehouse

To be covered, the stolen funds must have been in the "care and custody," or possession, of a messenger. (SOF ¶ 7). This is why coverage applies to a messenger or armored car. Cases construing this phrase under similar crime policies have reached this exact conclusion. *See, e.g., Cleveland Avenue Liquor Store, Inc. v. Home Insurance Co.*, 156 S.E.2d 202, 204 (Ga. App. 1967) ("lost money must be in the immediate custody or possession of the messenger at the time of the theft."); *Sansone v. American Ins. Co.*, 160 So.2d 575 (La. 1964) (no coverage when the insured's money was in a coat pocket in the cloak room while the purported messenger played dice); *Monteleone v. Amer. Emp. Ins. Co.*, 120 So.2d 70 (La. 1960)

---

(requiring personal custody); *J. & C. Drug Co. v. Maryland Cas. Co.*, 298 S.W.2d 516 (Mo. App. 1957) (No coverage when the insured's money had been temporarily placed in a safe when it was stolen). Here, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

(SOF ¶¶ 23, 26, 31).

**4.     The Loss is Excluded Because Plaintiffs Voluntarily Parted with the Funds**

Exclusion D.3.h. of the Policy provides the Outside the Premises Insuring Agreement does not cover "[l]oss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property." (SOF ¶ 12). Here, ██████████████████████████████████████

█████████████  (SOF ¶¶ 23, 26). Therefore, TCD voluntarily parted with the possession of the funds. As a result, their loss is excluded by Exclusion D.3.h. *See Midlothian Enterprises, Inc. v. Owners Insurance Company*, 439 F.Supp.3d 737, 742 (E.D. Va. 2020) (applying voluntary parting exclusion to bar coverage for social engineering loss where employee wired money to the fraudster's bank account, reasoning the fact the employee wired the money under false pretenses did not alter the voluntariness of that parting); *see also Martin, Shudt, Wallace, DiLornzo & Johnson v. Travelers Indem. Co.*, No. 1:13-CV-0498 LEK/CFH, 2014 WL 460045, at *3 (N.D.N.Y. Feb. 5, 2014) (voluntary parting exclusion barred coverage where "Plaintiff wired the funds at issue to another bank account, thereby voluntarily parting with the funds."). The same is true here. TCD was tricked into wiring money to Jirehouse's bank account, from which it was promptly stolen. Accordingly, Plaintiffs' alleged loss is barred by Exclusion D.3.h.

**5.     Plaintiffs' Loss is Excluded Because Jones And Jirehouse Were Plaintiffs' Authorized Representatives**

Exclusion D.1.c. excludes coverage for "[l]oss resulting from 'Theft' or any other dishonest act committed by any of your 'employees', 'managers' directors, trustees or

authorized representatives: (1) Whether acting alone or in collusion with other persons; (2) While performing services for you or otherwise; Except when covered under Insuring Agreement A.1." (SOF ¶ 13). The phrase "authorized representative" means "either a person or company empowered to act on an entity's behalf." *Stop & Shop Cos. v. Fed. Ins. Co.*, 136 F.3d 71, 74 (1st Cir. 1998); *see also C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1146 (8th Cir. 2019); *Telamon Corp. v. Charter Oak Fire Ins. Co.*, 932 F.3d 866, 871 (7th Cir. 2017); *Stanford Univ. Hospital v. Federal Ins. Co.*, 174 F.3d 1077, 1085 (9th Cir. 1999); *Kubota Credit Corp. U.S.A. v. Fed. Ins. Co.*, No. CV 10-2521-GHK , 2012 WL 12033876, at *4 (C.D. Cal. Apr. 2, 2012). Moreover, the authorized representative exclusion applies even if the loss occurs after the authorization has terminated so long as there is a causal connection between the act of entrustment and the resulting loss. *Pac. Marine Ctr., Inc. v. Phila. Indem. Ins. Co.*, 248 F. Supp. 3d 984, 997 (E.D. Cal. 2017); *Kubota*, 2012 WL 12033876, at *8.

███████████████████████████████████████████████████████████

███████████████████████████ (SOF ¶¶ 15-19, 48). There can be no question Jirehouse, including Jones, were authorized representatives of Plaintiffs. (SOF ¶ 71). Therefore, Exclusion D.1.c. applies to exclude Plaintiffs' claim for coverage under the Outside the Premises Insuring Agreement.

## C.    There Is No Coverage Under The Forgery Or Alteration Insuring Agreement

Plaintiffs seek coverage for the Loan Loss[11] under the Forgery or Alteration Insuring Agreement, which covers "loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money'" that are made, drawn by, or drawn upon by the insured or its agent. (SOF ¶ 14). ███

---

[11] Plaintiffs have asserted the Loan Loss is a separate "occurrence" under the Policy. But, Plaintiffs have alleged that Jones was involved in both the theft of the TCD Funds and November Funds as well as the Loan Loss. Thus, Plaintiffs "two" claims constitute a single occurrence under the Policy. For the same reasons, the Loan Loss would be excluded by Exclusion D.1.c. as discussed in Section B.5. above.

███████████████████████████████████████████████████ (SOF ¶¶ 86-88). But, Plaintiffs ignore the fact that the Loan Application is not a written promise similar to a check, draft, or promissory note. Further, the Loan Application does not reference a sum certain in money and was not drawn by, or drawn upon, Plaintiffs. Further, any forgery on the Loan Application did not directly result in a loss to anyone.

### 1. The Loan Application Is Not A Written Promise Similar To A Check, Draft, Or Promissory Note

In order to be covered, the forged document must be a "written promise" similar to a check, draft, or promissory note. (SOF ¶ 14). *First*, the Loan Application is not a promise, which is defined to mean the "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." *Promise*, Black's Law Dictionary (11th ed. 2019); *see also* Restatement (Second) of Contracts § 2 (Am. Law Inst. 1981) (same). Further, the plain and ordinary meaning of the term "application" is "[a] request or petition." *Application*, Black's Law Dictionary (11th ed. 2019); *see also Yan Yang v. Barr*, 939 F.3d 57, 67 (2d Cir. 2019) (Congress gave the word "application" in the statute its "broad, ordinary meaning: an application is a 'request.'").

The Loan Application contains no manifestation to act or refrain from acting. █████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████ (SOF ¶ 32). ████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████ (SOF ¶ 34). Thus, the Loan Application does not constitute a written promise.

*Second*, the Loan Application is not "similar to a check, draft, or promissory note." This provision has been consistently construed to apply only to negotiable instruments. 10 New

---

Appleman on Insurance Law Library Edition § 121.02 (2020). This interpretation reflects the interpretative principles of *ejusdem generis*, which provides "a general term that follows an enumeration of specific terms should be construed as applying only to things of the same general class as those specifically mentioned." *City of Glendale v. National Union Fire Ins. Co.*, 2013 WL 1296418, No. CV-12-380-PHX-BSB, at *7 (D. Ariz. Mar. 29, 2013); *see also Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 789-90 (Ariz. Ct. App. 2000) (a more general phrase should be interpreted in accordance with the prior specific terms). Courts analyzing the meaning of "written promise" in the same or similar insuring agreements rely on the *ejusdem generis* doctrine to determine its meaning. *See Midlothian*, 439 F.Supp.3d at 743; *CustomMade Ventures Corp. v. Sentinel Ins. Co.*, No. CIV.A. 11-10365-DPW, 2012 WL 4321060, at *5 (D. Mass. Sept. 17, 2012).

The Eastern District of Virginia applied the doctrine in interpreting a similar forgery and alteration insuring agreement and explained:

> Here, the phrase "or similar written promises, orders[,] or directions to pay a sum certain in 'money' modifies a specific list of items: checks, drafts, or promissory notes. The "promises, orders[,] or directions to pay" must, therefore, resemble a check, draft, or promissory note. Simply put, an email from a business owner telling an employee to wire money to a bank account does not have the same form or legal effect as a check, draft, or promissory note. Thus, it does not constitute a "covered instrument" under the explicit terms of the endorsement.

*Midlothian*, 439 F. Supp. 3d at 743; *see also Ryeco, LLC v. Selective Ins. Co.*, No. 20-3182, 2021 WL 1923028 (E.D. Pa. May 13, 2021) (collecting cases); 10 New Appleman on Insurance Law Library Edition § 121.02 (2020) ("Thus, to qualify as a 'similar written promise, etc.' under Insuring Agreement 2, the instrument in question must share the basic characteristics and functions of negotiable instruments or commercial paper.").

The Loan Application is not a negotiable instrument. Arizona's Uniform Commercial Code defines "negotiable instrument" as "an unconditional promise or order to pay a fixed

amount of money, with or without interest or other charges described in the promise or order." A.R.S. § 47-3104. It also requires the instrument (1) be payable to the bearer or to order when it is issued or first comes into possession of a holder, (2) be payable on demand or at a definite time; and (3) not state any other undertaking or instruction by the person promising or ordering payment. *Id.; see also Mecham v. United Bank of Ariz.*, 489 P.2d 247, 251 (Ariz. 1971) (to be a negotiable instrument, a writing must be signed by the maker, contain an unconditional promise or order to pay a sum certain in money, be payable on demand or at a definite time, and be payable to order or to bearer).

The Loan Application does not meet this standard. ███████████████

███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

(SOF ¶ 32) (emphasis added). As a result, the loan is conditional on any number of factors including Octopus's analysis of the Loan Application, issuance of an offer letter, and on RTC and Octopus accepting the terms of the loan before the loan completes. ███████████

███████████████████████████████████████

███████████████████ (SOF ¶ 35). ███████████████

███████████████████████████████████████

███████████████████ (SOF ¶ 35).

Courts analyzing the issue agree. *See Frank Shoop, Inc. v. TIG Insurance Co.*, No. 2007-CS-000691-MR, 2009 WL 874535, at *6 (Ky. Ct. App. Apr. 3, 2009); *see also L&H Enters., Inc. v. Allied Bldg. Prod. Corp.*, 596 A.2d 672, 677 (Md. Ct. App. 1991) (distinguishing cases "involving checks, promissory notes, or other negotiable instruments" because the credit application at issue was not a negotiable instrument); *Clendenin Lumber &*

*Supply Co. v. Volpi*, 365 S.E.2d 56, 57 (W. Va. 1987) ( an application for a line of credit with a supplier was not a negotiable instrument). Thus, the Loan Application cannot provide a basis for coverage under the Forgery or Alteration Insuring Agreement.

**2.     The Loan Application does not reference a sum certain in money and was not drawn by, or drawn upon, Plaintiffs**

To be covered, the forged document must also contain a written promise to pay a sum certain in money, and it must be drawn by, or drawn upon, Plaintiffs. ███████████████ ████████████████████████████████████████████████████████████ ████████████████ (SOF ¶ 35). *See, e.g., Childrens Place, Inc. v. Great Amer. Ins. Co.*, 2019 WL 1857118, No. 18-11963, at *4 (D.N.J. Apr. 25, 2019) (dismissing claim under Forgery or Alteration Insuring Agreement because the purported covered instrument did not reference a sum certain in money); *see also Leicht Transfer & Storage Co. v. Pallet Central Enterpr.*, 928 N.W.2d 534, 539 (Wis. 2019) (the purported covered documents "conspicuously lack any reference to a 'sum certain.' In fact, they do not reference an amount due, or even a calculation by which one may arrive at an amount due. Indeed, they say nothing about currency, payment, or anything else one might associate with money, much less a 'sum certain.'").

Additionally, ██████████████████████████████████████████ ████████████████████ (SOF ¶ 35). Courts have interpreted this "made or drawn" requirement in the commercial paper context to apply when "a party could demand payment from a bank." *Travelers Cas. & Sur. Co. of America v. Baptist Health Sys.*, 313 F.2d 295, 299 (5th Cir. 2002). This interpretation fits with Arizona's Uniform Commercial Code, which defines "drawer" as "a person who signs or is identified in a draft as a person ordering payment," and "maker" as "a person who signs or is identified in a note as a person undertaking to pay." A.R.S. § 47-3103 (2), (5); *see also Baptist Health System*, 313 F.2d at 517; *Taylor & Lieberman v. Fed. Ins. Co.*, 681 F. App'x 627, 628 (9th Cir. 2017). This element is missing from, and fatal to, Plaintiffs' claim under the Forgery or Alteration Insuring Agreement.

### 3. The Loss Did Not Result Directly From Forgery on the Loan Application

To be covered, the Loan Loss must have resulted directly from the alleged forgery. (SOF ¶ 14). Plaintiffs' causation argument is "sleight of hand." Any forgery on the Loan Application actually facilitated the loan to RTC, which was a gain, not a loss. The fact that the loan was paid back to Dragonfly did not cause a loss to RTC; it merely satisfied RTC's obligation to repay the loan. The loss to RTC was caused by the fact that Jones stole the loan proceeds. And, to the extent Plaintiffs' funded RTC's repayment of the loan, that was a voluntary decision by Plaintiffs to fund the settlement, not a direct loss from the forgery. *See Universal Mortg. Corp*, 651 F.3d at 762 ("a loss resulting from an insured's liability to third parties is not a direct loss under fidelity bond"); *Vons*, 212 F.3d at 491 ("Vons is covered only for direct losses to Vons caused by its employee's dishonesty, not for vicarious liability for losses suffered by others arising from its employee's tortious conduction"); *Sperling & Slater, P.C. v. Hartford Cas. Ins. Co.*, No. 12 C 761, 2012 WL 6720611, at *4 (N.D. Ill. Dec. 27, 2012) ("Courts have repeatedly held that employee dishonesty provisions do not cover losses suffered by a third-party that the insured subsequently reimburses because they are not direct losses. Rather, they are subsequent liabilities incurred by the insured."); *Kami Kountry Broad. Co. v. U.S. Fid. & Guar. Co.*, 208 N.W.2d 254, 257 (Neb. 1973) (no coverage under a fidelity bond where insured, in order to avoid loss of customer, paid note which was forged by insured's manager and on which it was not legally liable).

But, even if the forgery was a cause of the Loan Loss, it was remote, not direct. Any voluntary payment by Plaintiffs was made long after the alleged forgery. Courts interpreting the "resulting directly from" have held the loss must be the direct or "immediate result" of the wrongful act.[12] *See, e.g., Vons*, 213 F.3d at 492, *MPB Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022-PHX-GMS, 2019 WL 5789569, at *2 (D. Ariz. Nov. 6, 2019); *Flagstar*

---

[12] Exclusion D.1.g. ("Indirect Loss") also excludes "[l]oss that is an indirect result of an 'occurrence' covered by this Policy." (Ex. 2 (Policy, p. 3 of 14)).

*Bank, F.S.B. v. Fed. Ins. Co.*, 260 F. App'x 820, 825 (6th Cir. 2008); *Frank Shoop, Inc.*, 2009 WL 874535, at *8. Here, ██████████████████████████████████████████████ ████████████ (SOF ¶¶ 86-88). Thus, Meldman's signature must have directly caused a loss with no intervening event between it and the loss. It did not. Plaintiffs suffered no loss ████ ██████████████████████████████████ Instead, Plaintiffs' loss was the result of multiple intervening acts.[13] The lender r██████████████████████ and decided to make the loan to RTC. At that point, a loss had not occurred, and if nothing else happened, Plaintiffs would not have suffered a loss. Next, the lender offered the loan to RTC (not Plaintiffs). Again, still no loss. Then, sometime later, ██████████████████████████████████████ ████████ but still no loss to Plaintiffs. (SOF ¶ 36). ██████████████████████████ ████████████████████████████████████████ Only then did the potential for RTC (who is not an insured) to have a loss arise as a result of the theft of the loan proceeds, but there still was no loss to Plaintiffs. After that, ██████████████████████████ ██████████████████████████ Still no loss to Plaintiffs. And then, finally, ██████████ ██████████████████████████████████████████████████ ████████████ (SOF ¶ 42). Only at that much later point did RTC or Plaintiffs suffer a loss. Very clearly then, there were numerous intervening steps, without all of which the loss would not have occurred and this Court would not be reading this brief. Therefore, Plaintiffs are not entitled to coverage under the Forgery or Alteration Insuring Agreement for this additional reason.

## D.    Berkley Did Not Act In Bad Faith

To establish a breach of the duty of good faith and fair dealing, the insured must show:

---

[13] *See also Tri-City Nat'l Bank v. Fed. Ins. Co.*, 674 N.W.2d 617, 623 (Wis. 2003) (holding the loss did not "result directly from" where "it was only after the mortgage defaults occurred, some three years after the employee's deceitful actions, that Tri-City's liability to the mortgage came into being;" "the losses did not exist until the unsuitable mortgage holders defaulted on their loans and the mortgage companies sued Tri-City.").

"(1) that the insurer denied benefits under the policy without a reasonable basis, and (2) that the insurer knowingly or recklessly disregarded the lack of a reasonable basis for denying the benefits." *City of Glendale*, 2013 WL 1296418, at *18; *see also Desert Mountain Properties Ltd. P'ship v. Liberty Mutual Fire Ins. Co.*, 236 P.3d 421, 442 (Ariz. App. 2010). As detailed above, Berkley had more than a reasonable basis to deny Plaintiffs' claims, and thus, Berkley's actions do not constitute bad faith for the denial of coverage.

Moreover, while Arizona does allow an insured to bring a bad-faith claim even if coverage does not exist under the policy, BIC's actions in this matter do not constitute a "bad faith investigation." An "insurance company's failure to adequately investigate only becomes material to a bad faith claim when a further investigation would have disclosed relevant facts." *Carlson v. Indep. Order of the Foresters*, 2017 WL 957283, No. CV-15-01230-PHX-PGR, at *7 (D. Ariz. Mar. 13, 2017); *see also First Mercury Ins. Co. v. Cedar W. Capital, LLC*, 2012 WL 6217549, No. CV 12-8124-PCT-PGR, at *3 (D. Ariz. Dec. 13, 2012). BIC's investigation into this complex matter was reasonable, but even if BIC has "more thoroughly" investigated, there were no further relevant facts obtained in the extensive discovery in this action, including tens of thousands of pages of documents produced and the almost twenty depositions taken that would change BIC's position. (SOF ¶ 80-81, 90). Further, even if Plaintiffs were to succeed on their bad-faith investigation claim, █████████████████████████████ ████████████████████████████ (SOF ¶ 89). Thus, they cannot recover any compensatory damages and cannot be considered a prevailing party on their bad-faith claims. *McEvoy v. Aerotek, Inc.*, 34 P.3d 979, 982 (Ariz. App. 2001) ("plaintiff is the prevailing party when a jury reaches a verdict in favor of plaintiff and awards damages"). Accordingly, Plaintiffs cannot prevail on its bad-faith claims against Berkley.

## IV. CONCLUSION

BIC requests this Court grant its Motion and enter judgment in its favor.

DATED this 13th day of May, 2022.

CLARK HILL PLC

*/s/ J. Caralisa Connell*
Michael Keeley(*Admitted Pro Hac Vice)*
J. Caralisa Connell(*Admitted Pro Hac Vice*)
Ryan J. Lorenz

*Attorneys for Berkley Insurance Company*

## CERTIFICATE OF SERVICE

I certify that, on May 13, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which automatically sends a Notice of Electronic Filing to all counsel of record. I further certify that, on May 13, 2022, I sent an unredacted version of this document to all counsel of record via electronic mail.

*/s/ J. Caralisa Connell*
J. Caralisa Connell