**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Discovery Land Company LLC, et al., | No. CV-20-01541-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Berkley Insurance Company, et al., | |
| Defendants. | |

Plaintiffs Discovery Land Company, LLC (DLC), Discovery Land Enterprises, LLC (DLE), and Taymouth Castle DLC, LLC (TCD) bought a castle in Scotland. In connection with that transaction, Plaintiffs were allegedly defrauded by an attorney out of almost $18 million dollars. Plaintiffs submitted two proofs of loss to their insurers, Defendants Berkley Insurance Company (BIC) and Great American Insurance Company (GAIC). BIC and GAIC both refused to pay for Plaintiffs' losses. Plaintiffs filed this suit seeking declaratory judgement and claiming breach of contract and bad faith, arguing BIC and GAIC unlawfully refused to indemnify Plaintiffs. The parties filed cross-motions for summary judgment. For the reasons below, the Court will grant summary judgment on Plaintiffs' claims in favor of Defendants.

### BACKGROUND

Unless otherwise noted, the following facts are undisputed.

**1. The First Loss: Jones' Alleged Theft**

In early April 2018, Plaintiffs decided to purchase the Taymouth Castle, located in

Scotland. (DLC SOF at ¶ 34). On April 11, 2018, DLC entered into a "General Terms of Engagement" letter with Jirehouse, a U.K. law firm. (BIC SOF at ¶ 16; Doc. 149-3). DLC later executed a "Specific Engagement Terms" letter related to the purchase of the Castle dated May 24, 2018. (BIC SOF at ¶ 17; Doc. 149-4). The "Specific Engagement Terms" letter specified: "The scope of our engagement is to advise and act on: (a) the purchase of Taymouth Castle, Perthshire, Scotland . . . (c) the purchase of design and development rights and management company for the [Castle]; and (d) the structuring of the [Castle] holding in the most tax efficient way in accordance with the tax laws and regulations of the United Kingdom." (Doc. 149-4 at 4). The nature of Plaintiffs' relationship with Jirehouse is highly contested by the parties. Defendants claim Plaintiffs hired Jirehouse to provide legal assistance with the purchase of the Castle. (BIC SOF at ¶¶ 15, 18, 19). Plaintiffs claim they hired Jirehouse to "act as DLC's partner in effecting the transaction to purchase" the Castle, and that "Jirehouse did not merely serve as legal counsel." (Doc. 214-2 at ¶ 18).

Stephen David Jones ("Jones") was a solicitor with Jirehouse. (BIC SOF at ¶ 10). Jones recommended (and the "Specific Engagement Terms" letter specified) that DLC use a U.K. company affiliated with Jirehouse, Esquiline Asset Managers Limited ("EAML"), as the entity actually purchasing the Castle, and that after EAML purchased the Castle, EAML would in turn sell the Castle to the River Tay Castle, LLP ("RTC"). (BIC SOF at ¶ 22; DLC SOF at ¶ 55; Doc. 149-4 at 4). Plaintiffs argue that EAML was "a Jirehouse entity," in that Jirehouse owned and controlled it as "part of the Jirehouse family of companies." (DLC SOF at ¶¶ 52, 53, 56). Defendants dispute that Jirehouse ever had any ownership or control of EAML. (Doc. 210-34 at ¶¶ 52-57 (arguing Plaintiffs' claim is supported only by hearsay testimony by people who have no personal knowledge of EAML's ownership)). While the record on this point is not fully developed, there is some evidence the purchase was structured to use EAML as a middleman in this way to obscure the involvement of the John Paul DeJoria Family Trust ("DeJoria Trust").[1] (E.g., Doc. 144-

---

[1] There is a dispute about the relationship between the DeJoria Trust and Plaintiff TCD. Michael Meldman is the ultimate beneficial owner of DLC. (GAIC SOF at ¶ 15; Doc. 215-2 at ¶ 17). Plaintiffs claim TCD was wholly owned by DLE, which in turn is part of DLC.

1    25 at 5).

2        In April 2018, the seller and buyers agreed on a purchase price for the Castle:

3    £9,620,000. (Doc. 149-8 at 5; DLC SOF at ¶ 34). Plaintiff TCD is an entity that was formed

4    in the Spring of 2018. (DLC SOF at ¶ 18). Plaintiffs argue TCD was formed for the express

5    purpose of purchasing and acquiring Taymouth Castle. (DLC SOF at ¶ 18). The DeJoria

6    Trust loaned TCD the necessary funds ($14,050,000) pursuant to an On Demand Loan

7    Note "to finance the acquisition of Taymouth Castle." (GAIC SOF at ¶ 20; Doc. 215-2 at

8    ¶ 20; Doc. 215-3). TCD then wired the total of $14,050,000 (the purchase price plus an

9    amount intended to cover attorneys' fees and expenses) to Jirehouse Trustees General

10   Client Account. (BIC SOF at ¶ 23; GAIC SOF at ¶ 21; Doc. 214-2 at ¶ 23). Jirehouse

11   transmitted only a portion of that payment to the Castle seller as a deposit (10% of the

12   purchase price). (BIC SOF at ¶ 23; Doc. 214-2 at ¶ 23).

13       Thereafter, Jones told Plaintiffs that because of "compliance issues" (Doc. 152 at

14   5), Plaintiff would need to provide an additional $9,300,000 to complete the transaction.

15   (BIC SOF at ¶ 27; Doc. 214-2 at ¶ 27). DLC wired the requested $9,300,000 to Jirehouse.

16   (BIC SOF at ¶ 28). Jirehouse then transmitted that $9,300,000 to the Castle seller,

17   completing the sale of the Castle. (BIC SOF at ¶ 29; Doc. 214-2 at ¶ 29). EAML held title

18   to the Castle from December 6, 2018 until December 31, 2018. (DLC SOF at ¶ 60).

19   Thereafter, EAML sold the Castle to RTC. (BIC SOF at ¶ 30; DLC SOF at ¶ 30).

20       Plaintiffs contend Jones stole at least $12,754,185.99 of the first $14,050,000 wire.

21   (BIC SOF at ¶ 31; GAIC SOF at ¶ 22; Doc. 214-2 at ¶ 31). Plaintiffs argue they requested

22   the return of the extra $9,300,000 they had paid, but through early March of 2019, Jones

23   continued to assert there were compliance issues that prevented him from doing so, and

24   _____

25   (Doc. 215-2 at ¶ 17). However, on April 13, 2018, TCD's operating agreement was
     amended to retroactively admit the DeJoria Trust as the controlling member with a 93.77%

26   interest in TCD. (Doc. 210-40). Plaintiffs argue that agreement was rescinded that same
     day, and that by January 2019, DLE was the only equity member of TCD. (Doc. 215-2 at

27   ¶ 17; DLC SOF at ¶ 79). However, the Certificate of Rescission was apparently never
     signed by Meldman. (Doc. 213-13 at 22). Defendants further argue there is no support for

28   the contention that DLE was part of DLC. (Doc. 210-34 at ¶ 79).

that he would return the funds once the issues were resolved. (Doc. 213-1 at 5).

**2. The Second Loss: The Dragonfly Loan**

According to Plaintiffs, Jones was not content with stealing some of the purchase funds. Jones also allegedly benefitted from a fraudulent loan taken out by RTC and secured by the castle. Plaintiffs claim Dragonfly Finance S.A.R.L. ("Dragonfly"), a financial firm with no apparent connection to Plaintiffs, obtained a security interest in the Castle in exchange for extending credit to RTC. (GAIC SOF at ¶ 24). On October 11, 2018, a loan application was signed appearing to bear the signature of Michael Meldman, the ultimate beneficial owner of DLC. (DLC SOF at ¶¶ 63, 65; Doc. 210-8; GAIC SOF at ¶ 15; Doc. 215-2 at ¶ 17). Meldman has no recollection of signing the loan application nor did he authorize anyone to sign the application for him. (DLC SOF at ¶¶ 63, 65; Doc. 210-8). Hence, Plaintiffs claim the signature was forged. (DLC SOF at ¶ 66). On January 21, 2019, a Loan Facility Agreement ("Dragonfly loan") was executed between RTC (signed by John Clark, a director of RTC)[2] and Dragonfly. (BIC SOF at ¶¶ 36, 38; Doc. 210-9). Then on February 21, 2019, Clark also executed a "charge" granting Dragonfly a security interest in the Castle for any amounts drawn under the Dragonfly loan. (BIC SOF at ¶ 38; Doc. 210-10). Plaintiffs suggest Clark was not acting according to their authority in securing this loan. (*See* Doc. 149-9 at 5; Doc. 215-2 at ¶ 37). Dragonfly disbursed nearly 5 million pounds under the Dragonfly loan to an account owned by Jirehouse, and Jones apparently then transferred the money for his own use. (GAIC SOF at ¶ 25).

RTC defaulted on its payments, and Dragonfly demanded immediate payment. (BIC SOF at ¶ 41). RTC settled with Dragonfly after a dispute over the validity of the Dragonfly loan and Dragonfly security interest, under which RTC agreed to pay nearly 5 million pounds to release the Dragonfly Charge. (BIC SOF at ¶ 42; Doc. 210-25 ("Dragonfly

---

[2] The parties do not provide any arguments about the role of John Clark, and whether he was connected with the parties. It appears Clark may have been connected to Jones and Jirehouse in some capacity. In BIC's denial letter, it states Clark was a registered director of EAML. (Doc. 210-28 at 4). In any case, while Clark's exact relationship to the parties is not clear, it does not affect the Court's reasoning below.

Settlement")). Plaintiffs maintain DLE and DLC incurred this loss, because DLE owned TCD, which in turn owned RTC. (Doc. 214-2 at ¶ 37). Plaintiffs allege they paid out the settlement agreement on behalf of RTC. (BIC SOF at ¶ 43; Doc. 210-20 at 20-21).

Plaintiffs assert they discovered both losses on March 6, 2019. (GAIC SOF at ¶ 26; Doc. 209-8 at 3; 209-9 at 3).

### 3. The Insurance Claims

On March 18, 2019, DLC provided notice to BIC and GAIC of the two losses. (DLC SOF at ¶ 76). On March 19, BIC and GAIC respectively acknowledged receipt of Plaintiffs' notice of loss. (DLC SOF at ¶¶ 77-78).

On July 26, 2019, well after the discovery of the losses, DLC retroactively requested the following additional entities be added to the 2019-2020 Policies as insureds: Taymoth [sic] Management (No. 1), LP (US), Plaintiff TCD, The River Tay Management Ltd (UK Entity), Taymouth Management (No. 2) LP (UK Entity), The River Tay Management LLP (UK Entity), the DeJoria Trust, and Plaintiff DLE. (Doc. 210-34 at ¶ 24; DLC SOF at ¶ 24). On July 29, 2019, BIC issued Change Endorsement No. 26 adding those names to the 2019-2020 Primary Policy; BIC did not request any information about these entities, nor did it require any additional premium. (DLC SOF at ¶¶ 25, 27; Doc. 210-34 at ¶¶ 25, 27).[3]

On July 30, the day after BIC issued Endorsement No. 26, DLC submitted two detailed proofs of loss. (Docs. 210-11 and 210-12). Defendants claim this was the first time Plaintiffs informed them that TCD, RTC, or the DeJoria Trust had sustained losses. (GAIC SOF at ¶ 34). Proof of Loss No. 1 sought coverage for the First Loss (Jones' alleged theft of the Castle purchase funds in late 2018 and early 2019) under the Employee Theft Insuring Agreement (Section A.1) and the Outside the Premises Insuring Agreement (Section A.5). (BIC SOF at ¶ 73; Doc. 210-11 at 4). Proof of Loss No. 2 sought coverage for the Second Loss (funds taken out under the Dragonfly Loan in late 2018 and early 2019) under the Forgery or Alteration Insuring Agreement (BIC SOF at ¶ 75; Doc. 210-12 at 4).

---

[3] DLC also requested additional names be added to the Primary Policy on October 31, 2019, and on December 20, 2019; BIC issued Change Endorsement Nos. 30 and No. 31 adding those names. (DLC SOF at ¶¶ 28-32).

BIC denied Plaintiffs' claim for coverage under the Primary Policy on May 21, 2020. (BIC SOF at ¶ 80; Doc. 210-28). BIC stated its position was "that this claim does not trigger coverage under any of the Policy insuring agreements." (Doc. 210-28 at 2).

**4. The Insurance Policies**

In early 2018, Defendant BIC issued a Primary Commercial Crime Policy and GAIC issued an Excess Policy, each with a policy period of January 28, 2018 to January 28, 2019.[4] (BIC SOF at ¶ 1; DLC SOF at ¶¶ 1, 5). BIC subsequently issued an additional Primary Policy, and GAIC issued an additional Excess Policy, each with a policy period of January 28, 2019 to January 28, 2020.[5] (DLC SOF ¶¶ 3, 6; BIC SOF at ¶ 1). The Declarations Page of the Primary Policy identifies the "Named Insured" as "Discovery Land Company, LLC." (BIC SOF at ¶ 2; GAIC SOF at ¶ 2; Doc. 149-2 at 4). The Excess policy also identified the "Named Insured" as "Discovery Land Company" and has a "Single Loss Limit of Liability" of $2,500,000. (GAIC SOF at ¶ 11; Doc. 209-4 at 4)). The Excess Policies follow form in most, but not all, respects, to the Primary Policies. (DLC SOF at ¶ 7; Doc. 210-34 at ¶ 7).

On January 31, 2018, DLC provided a list of named insureds to BIC and GAIC, which Defendants incorporated into the 2018-2019 policies. (DLC SOF at ¶¶ 12-13).[6] On August 23, 2018, DLC requested to add Taymouth Castle Limited and EAML to the 2018-

---

[4] BIC issued Policy No. BCCR-45002757-20, and GAIC issued Policy No. XSC E315871 00 00. (BIC SOF at ¶ 1); (DLC SOF at ¶¶ 1, 5).

[5] BIC issued Policy No. BCCR-45002757-21, and GAIC issued Policy No. XSC E315871 01 00. (DLC SOF ¶¶ 3, 6).

[6] Plaintiffs argue these policies are so-called "Master Policies" covering all of Discovery Land Company projects worldwide, including all the entities associated with each project/property. (Doc. 214-2 at ¶ 3). GAIC argues the River Tay Castle, LLP, the John Paul DeJoria Family Trust, and Taymouth Castle DLC, LLC were not identified as joint insureds at the time the primary policy was issued, nor at the time of Plaintiffs' alleged loss. (GAIC SOF at ¶ 4). BIC also argues that River Tay Castle, LLP ("RTC"), the entity which ultimately owned the Castle, was not listed on the Joint Insured Endorsement of the Policy at the time the Policy was issued or at the time of the loss. (BIC SOF at ¶ 3). Because the Court finds the Primary Policy does not cover the losses incurred here, even if relevant parties who suffered the losses were in fact insured under the policies, the Court need not address the issue of which entity was covered and when.

2019 Policies as named insureds. (*Id.* at ¶ 19). BIC issued Change Endorsement No. 25 adding these two entities as Named Insureds later that same day. (*Id.*). Additional entities were retroactively added to the Primary Policy in 2019, after the discovery of the Losses. (*See supra*).

a.  **BIC's Primary Policy Provisions**

Section A.1 of the Primary Policy, titled "Employee Theft," provides: "We will pay for loss of or damage to 'money,' 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee,' whether identified or not, acting alone or in collusion with other persons." (BIC SOF at ¶ 4; Doc. 149-2 at 7 ("Section A.1"). As relevant, the Policy defines "employee" as

> "any natural person:
>
> > (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to 'theft' or any other dishonest act committed by the 'employee';
> >
> > (b) Whom you compensate directly by salary, wages or commission; and
> >
> > (c) Whom you have the right to direct and control while performing services for you."

(Doc. 149-2 at 18, paragraph 7.a). The Policy specifies that "employee" does not mean "any agent, broker, factor, commission merchant, cosignee, independent contractor or representative of the same general character not specified in paragraph 7.a." (Doc. 149-2 at 19).

Section A.2 of the Primary Policy, titled "Forgery or Alteration," provides:

> "We will pay for loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money' that are:
>
> > (1) Made or drawn by or drawn upon you; or
> >
> > (2) Made or drawn by one acting as your agent;

1        Or that are purported to have been so made or drawn."

2   (Doc. 149-2 at 7 ("Section A.2")).

3        <u>Section A.5</u> of the Primary Policy, titled "Outside the Premises," specifies that BIC

4   "will pay for":

5            "(a) Loss of 'money' and 'securities' outside the 'premises' in the care and

6            custody of a 'messenger' or an armored motor vehicle company resulting

7            directly from 'theft', disappearance or destruction."

8   (Doc. 149-2 at 8 ("Section A.5")). The Primary Policy defines "messenger" as "you, your

9   relative, or any of your partners or 'members', or any 'employee' while having care and

10  custody of property outside the 'premises'." (Doc. 149-2 at 19). "Member" is defined as

11  "an owner of a limited liability company represented by its membership interest who, if a

12  natural person may also serve as a 'manager'." (*Id.*)[7] The term "partner" is not defined in

13  the policy. (*See id.*).

14       As relevant, the Primary Policy also provides for some exclusions. <u>Exclusion D.1.a</u>

15  ("Acts Committed by You, Your Partners Or Your Members") provides that the policy

16  does not cover:

17           "Loss resulting from 'theft' or any other dishonest act committed by:

18               (1) You; or

19               (2) Any of your partners or 'members';

20           Whether acting alone or in collusion with other persons."

21  (Doc. 149-2 at 8 ("Exclusion D.1.a")).

22       <u>Exclusion D.1.c</u> excludes:

23           "Loss resulting from 'theft' or any other dishonest act committed by any of

24           your 'employees', 'managers', directors, trustees or authorized

25           representatives:

26               (1) Whether acting alone or in collusion with other persons; or

27   _____

28  [7] "Manager" is defined as "a natural person serving in a directatorial capacity for a limited liability company." (Doc. 149-2 at 19).

- 8 -

(2) While performing services for you or otherwise;

Except when covered under [Section] A.1."

(Doc. 149-2 at 9 ("Exclusion D.1.c")).

Exclusion D.3.h applies to Section A.5 ("Outside the Premises") and specifically excludes "Loss resulting from your, or anyone else acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property." (Doc. 149-2 at 11 ("Exclusion D.3.h").

**b.  GAIC's Excess Policy**

GAIC's Excess Policy provides coverage for loss which "would have been paid under the [underlying policy] but for the fact that such loss exceeds the limit of liability of the Underlying Carrier(s)" and "for which the Underlying Carrier(s) has (have) made payment, and the Insured has collected, the full amount of the expressed limit of the Underlying Carrier's(s) liability." (Doc. 209-4 at 4). The underlying policy coverage is the Primary Policy issued by BIC. (GAIC SOF at ¶ 13).

**5.  The Lawsuit**

Plaintiffs filed suit in June 2020, seeking declaratory judgments against BIC and GAIC that Plaintiffs are entitled to indemnification under the insurance policies, claiming breach of contract against BIC and GAIC, and bad faith against BIC. BIC and GAIC both filed counterclaims seeking rescission of the change endorsements, arguing Plaintiffs fraudulently added entities as joint insureds after they discovered the losses.

Plaintiffs filed a motion for partial summary judgment (Doc. 151), arguing coverage exists because the term "partner" as used in the definition of "messenger" in the Primary Policies should be construed to cover Jirehouse and that the forgery of Meldman's signature on the Dragonfly loan is covered under the policy's coverage for "forgery." Plaintiffs also seek summary judgment in their favor on various affirmative defenses and counterclaims.

BIC filed a motion for summary judgment (Doc. 145) arguing, with respect to the first loss, (i) there is no coverage under the Employee Theft provision (Section A.1)

because Jones was not an "employee"; (ii) there is no coverage under the Outside the Premises provision (Section A.5) because Jirehouse was not Plaintiffs' "partner"; and (iii) various exclusions apply, preventing coverage. With respect to the second loss, BIC argues there is no coverage under the Forgery or Alteration provision (Section A.2). Lastly, BIC argues they did not act in bad faith.

GAIC also moved for summary judgment on all claims asserted against it. (Doc. 147). GAIC first argues that the Excess Policy, by its own terms, only applies to losses that are covered under the primary policy, and for which DLC has received full payment from the primary carrier. GAIC further argues the "known loss doctrine" bars coverage, because Plaintiffs already knew TCD had sustained the losses for which it sought coverage when they added TCD as a joint insured.

## LEGAL STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. *Id*. When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). When parties file cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side,

whether a judgment may be entered in accordance with the Rule 56 standard." *Echanove v. Allstate Ins. Co.*, 752 F. Supp. 2d 1105, 1107-08 (D. Ariz. 2010) (quoting *Fair Housing council of Riverside Cty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## ANALYSIS

### 1. Primary Policy Coverage

Arizona law applies to this case. *See Team 44 Restaurants LLC v. Am. Ins. Co.*, 562 F. Supp. 3d 61, 65 (D. Ariz. 2021). In Arizona, courts apply "a rule of common sense" when interpreting insurance policies. *First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 300 (Ariz. 2016) (quoting *Emps. Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 515 (2008)). "Under this rule, words are given their ordinary meaning and read from the perspective of one who 'is untrained in the law or insurance.'" *Team 44 Restaurants LLC*, 562 F. Supp. 3d at 65 (quoting *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 966 (Ariz. Ct. App. 2010)). "Insurance policy provisions must be read as a whole, giving meaning to all terms." *Liberty Ins. Underwriters, Inc. v. Weitz Co., LLC*, 158 P.3d 209, 212 (Ariz. Ct. App. 2007). Courts consider "legislative goals, social policy, and [perform an] examination of the transaction as a whole." *Team 44 Restaurants LLC*, 562 F. Supp. 3d at 65 (quoting *Emps. Mut. Cas. Co.*, 183 P.3d at 515). If the meaning of a policy remains ambiguous, courts then construe the policy against the insurer. *Id.* The interpretation of an insurance policy is a question of law. *Emps. Mut. Cas. Co.*, 183 P.3d at 515.

### a. Whether There is Coverage Under the Employee Theft Insuring Agreement (Section A.1)

BIC moves for summary judgment on this issue, arguing there can be no coverage under the Employee Theft Insuring Agreement (Section A.1) because Jones, who allegedly perpetrated the theft, was not Plaintiffs' "employee."

Section A.1 provides: "We will pay for loss of or damage to 'money,' 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee,' whether identified or not, acting alone or in collusion with other persons." (Doc. 149-2 at 7). As relevant, the Policy's definition of "employee" requires three elements: (i) that Jones was

in Plaintiffs' service; (ii) that Plaintiffs compensated Jones "directly by salary, wages or commission"; and (iii) that Plaintiffs had "the right to direct and control" Jones while he performed services for them. (Doc. 149-2 at 18, ¶ 7.a). BIC argues that none of these requirements are met here, but Plaintiffs argue there is a genuine dispute of material fact as to each of these elements. The requirements that Jones be in Plaintiffs' service and that Plaintiffs had the right to direct and control his work can be analyzed together. First, however, the Court will look to whether Plaintiffs compensated Jones directly.

### i. Direct Compensation by Salary, Wages or Commission

It is undisputed any payment Plaintiffs paid Jones "flowed through Jirehouse." (BIC SOF at ¶ 46). BIC argues "direct means direct," or immediate. *Vons Cos. v. Fed. Ins. Co.*, 213 F.3d 489, 492 (9th Cir. 2000). Thus, BIC argues, since Plaintiffs paid Jirehouse, and Jirehouse paid Jones, it was not a "direct" form of compensation. (Doc. 210-1 at 6-7). Plaintiffs, on the other hand, argue the funds they paid to Jirehouse were earmarked for particular purposes, and that Jones was supposed to be paid for the deal at closing out of funds they provided. (Doc. 214-1 at 9). Thus, Plaintiffs argue they were in control of the funds and of the way they were routed to Jones.

The analysis begins with reading the phrase "compensate directly" as a plain and ordinary person would. *Team 44 Restaurants LLC*, 562 F. Supp. 3d at 65. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "marked by absence of intervening agency, instrumentality, or influence," or "stemming immediately from a source." Merriam-Webster Online, merriam-webster.com/dictionary/direct. It is undisputed Plaintiffs wired the legal fees and purchase price to an account owned by Jirehouse. Jirehouse was then an "intervening agency," or a "deviation" between Plaintiffs and Jones. The fact that the payments were "earmarked" for the purchase of the Castle, related legal fees, and Jones' compensation as a matter of law does not mean the payments were "direct" such that it would render Jones an employee of Plaintiffs.

Courts in other jurisdictions analyzing the same definition of "employee" in

insurance contracts agree. In *T.S.I. Holdings, Inc. v. Buckingham*, 885 F. Supp. 1457 (D. Kan. 1995), for example, the Court found that where an individual received his paycheck from a parent corporation, he was not "compensated directly" by the wholly owned subsidiary who suffered the loss, even though a portion of the funds used to pay him came from the subsidiary. *Id.* at 1464. Similarly, in Minnesota, a court granted summary judgment in favor of a defendant insurance company because the person convicted of the underlying theft was employed through a corporate entity that person had established. *Network F.O.B., Inc. v. Great Am. Ins. Co. of N.Y.*, 30 F. Supp. 3d 831, 834 (D. Minn. 2014). Thus, the court held, the person convicted of theft was not "compensated directly" by the insured; instead, the "employment relationship . . . flowed through a corporate entity." *Id.* at 835.

Plaintiffs urge the Court to follow *Dataflow, Inc. v. Peerless Ins. Co.*, 2014 WL 4881534, at *4 (N.D.N.Y. Sept. 30, 2014). In that case, the court declined to apply the "categorical rule" of *T.S.I. Holdings*, and instead looked to other areas of law where "direct compensation" is analyzed using many factors, including degree of control, who deposited the funds, and more. *Id.* However, that case is distinguishable. There, the individual was paid from a master account that three related corporate entities deposited money into; the court reasoned, "[i]t cannot be the case that the simple combination of funds to create a single paycheck—rather than three separate checks—itself is enough to deem compensation not 'direct.'" *Id.* The facts here are materially different. Jirehouse is completely independent of Plaintiffs' corporations. Plaintiffs wired money to Jirehouse pursuant to the engagement letters. Even if a portion of those funds was paid to Jones upon closing, as Plaintiffs argue, the funds still flowed through Jirehouse. Thus, Jones was not "compensated directly" by Plaintiffs under a plain reading of the policy.

Additionally, it is clear Plaintiffs did not compensate Jones by "salary" or "wages."[8]

---

[8] It is undisputed Plaintiffs did not pay Jones a "salary." (BIC SOF at ¶ 54). Plaintiffs argue the funds paid to Jirehouse to pay Jones could be interpreted as "wages." (Doc. 214-1 at 9). The Court disagrees. Whether taking the definitions proposed by BIC from Arizona case law (Doc. 210-1 at 7) or considering the meaning of "wage" as an ordinary person

The only possible relevant category in the policy is "commission," since Jones was apparently paid at closing. A "commission" is defined as "a fee paid to an agent or employee for transacting a piece of business or performing a service." Merriam-Webster Online, merriam-webster.com/dictionary/commission. *See also Commission*, Black's Law Dictionary (11th ed. 2019) (defining "commission" as "a fee paid to an agent or employee for a particular transaction, as a percentage of the money received from the transaction."). Plaintiffs argue they paid Jones a commission out of the total funds wired to Jirehouse after closing. (Doc. 214-1 at 10). However, their evidence does not support that contention. Rather, the funds were paid to Jirehouse and placed in the Client Account, and £300,000 in fees and disbursements were taken from that account between June 2018 and closing, apparently to pay Jones. (*See* Doc. 214-8). (*See also* Doc. 181-8 at 30 ("we received reconciliation statements from Jirehouse, statement and uses of funds from Jirehouse . . . as the deal is progressing to closing, we get these reconciliation statements to show all the disbursements. And that's how Jirehouse and other attorneys got paid"); Doc. 149-3 at 6 (general engagement letter with Jirehouse) ("You will be required to pay in advance or reimburse us for disbursements incurred on your behalf . . .")). Even if Jirehouse paid Jones a commission out of the general funds provided by Plaintiffs, nothing was paid to Jones by Plaintiffs directly; in other words, Plaintiffs did not directly pay Jones a commission.

### *ii. In Plaintiffs' Service and Under Plaintiffs' Direction and Control*

Because the Policy's definition of "employee" is conjunctive, Plaintiffs' claim for coverage under this provision fails upon the direct compensation requirement alone. However, even if he were "directly compensated," Jones nevertheless fails to meet the other two requirements of the insurance policy's definition of "employee": namely, that he was in Plaintiffs' service and that he was under Plaintiffs' direction and control.

The parties have pointed to no Arizona authority on the interpretation of these provisions of the definition of "employee" within an insurance policy, and the Court is

---

would as Plaintiffs urge, the Court comes to the same conclusion: wiring Jirehouse funds in relation to the engagement letters is not directly paying a "wage" to Jones.

aware of none. BIC urges the Court to follow courts in other jurisdictions which look to workers' compensation law to help define these requirements. (Doc. 142 at 8); *Cedar Lake Homeowners Ass'n v. Northwest Empire Cmt. Mgmt.*, No. 3:14-CV-00599-PK, 2015 WL 5970481, at *5 (D. Or. Oct. 13, 2015); *Jerome Grp., Inc. v. Cincinnati Ins. Co.*, 257 F. Supp. 2d 1217, 1226 (E.D. Mo. 2003) (applying Missouri workers' compensation law to analyze same definition of "employee" in an insurance policy").[9] Plaintiffs urge the Court to ignore that framework and rely on more general "right to control" analysis from the vicarious liability framework. (Doc. 185 at 7). A third possibility exists: at least one other court has analyzed this same definition within an insurance contract and found, reading the insurance policy under its plain and ordinary meaning and without resort to any broader area of law, that "[t]he Court need not look beyond the Policy, which it finds unambiguous." *GRM Mgmt., LLC v. Cincinnati Ins. Co.*, 259 F. Supp. 3d 411, 417 (E.D. Va. 2017) (finding the company did not "direct and control" the individual performing services because, *inter alia*, there was an independent contractor agreement, he was not supervised by the company, he did not have a weekly hour requirement and worked on a project basis).

Regardless of which analysis the Court undertakes, the Court has no trouble finding Jones was not "directed and controlled" by Plaintiffs as contemplated by the policy language. Plaintiffs did not retain Jones under an employment agreement; rather, Jones was a "Principal/Partner" at Jirehouse, a separate entity. (Doc. 149-4 at 6). Plaintiffs retained Jirehouse for the purpose of acquiring the Castle. (Doc. 149-4 at 2, 4; BIC SOF at ¶ 59). Jones was one of many solicitors working on the Transaction for Plaintiffs. (BIC SOF at ¶ 21). Plaintiffs paid their fees to the Jirehouse law firm's General Client Account (Doc. 214-2 at ¶ 47), and they made no "regular payments" to either Jirehouse or Jones. (BIC

---

[9] The factors under this test include: "(1) the extent of control, (2) the actual exercise of control, (3) the duration of the employment, (4) the right to discharge, (5) the method of payment, (6) the degree to which the alleged employer furnished equipment, (7) the extent to which the work is the regular business of the employer, and (8) the employment contract." *Jerome Grp., Inc.*, 257 F. Supp. 2d at 1226 (quoting *Wilmeth v. TMI, Inc.*, 26 S.W.3d 476, 480 (Mo.Ct.App.2000)).

SOF at ¶ 50). Plaintiffs did not report payments to Jirehouse or Jones as salary or wages to the U.K. Government, nor did they withhold any taxes or employers' liability insurance from its payments made to Jirehouse for Jones' work. (BIC SOF at ¶¶ 51-52). Jirehouse was responsible for its own insurance. (BIC SOF at ¶ 62). Plaintiffs did not provide any equipment to Jones (BIC SOF at ¶ 60), and Jones and Jirehouse used their own resources and expertise to provide services for Plaintiffs. Plaintiffs could terminate Jirehouse's representation, but they had no authority to terminate Jones' relationship with Jirehouse. (BIC SOF at ¶ 61; Doc. 214-2 at ¶ 61). While the General Engagement Letter specified that Jirehouse shall provide "services in accordance with your instructions and our agreement to act upon them," (Doc. 149-3 at 3), that does not render Jones an employee of Plaintiffs.

Rather, the Primary Policy specifies "employee" does not include "any agent, broker, factor, commission merchant, cosignee, independent contractor or representative of the same general character not specified in paragraph 7.a [which includes the definition above]." (Doc. 149-2 at 19). The Specific Engagement Terms Letter specifies Jirehouse is "engaged to act on [Plaintiffs'] behalf" with respect to various parts of the Castle transaction. (Doc. 149-4 at 2). The hallmarks of an independent contractor, representative, or agent relationship are evident here. Plaintiffs retained Jirehouse to navigate purchasing the Castle; Plaintiffs did not hire Jones as an employee.

Accordingly, BIC's motion for summary judgment on the applicability of the Employee Theft Insuring Agreement (Section A.1) will be granted.

### b. Whether There is Coverage Under the Outside the Premises Insuring Agreement (Section A.5)

Even though Jones was not Plaintiffs' "employee," coverage may still exist under a separate provision regarding losses of funds while in the custody of a "messenger." Under the "Outside the Premises" provision, the Policy specifies that BIC "will pay for": "Loss of 'money' and 'securities' outside the 'premises' in the care and custody of a 'messenger' or an armored motor vehicle company resulting directly from 'theft', disappearance or

destruction." (Doc. 149-2 at 8). The Primary Policy defines "messenger" as "you, your relative, or any of your partners or 'members', or any 'employee' while having care and custody of property outside the 'premises'." (Doc. 149-2 at 19). "Member" is defined as "an owner of a limited liability company represented by its membership interest who, if a natural person may also serve as a 'manager'." (*Id.*)[10] The term "partner" is not defined in the policy. (*See id.*).

Plaintiffs move for summary judgment on this issue and argue that under the plain meaning of "partner," Jirehouse was Plaintiffs' partner in purchasing the castle, so the loss should be covered. Plaintiffs argue "partner" is broadly defined as "one associated with another especially in an action," and Jirehouse was associated with Plaintiffs in the action of purchasing the Castle. (Doc. 214-1 at 3). Thus, Plaintiffs argue, Jirehouse was Plaintiffs' partner such that the loss is covered under this provision.

BIC cross-moves for summary judgment and argues Plaintiffs' losses are not covered under the Outside the Premises Insuring Agreement (Section A.5) because Jirehouse was not Plaintiffs' "partner," and was therefore not a "messenger" under this policy. BIC argues the term "partner" refers to someone who jointly owns and carries on a business for profit. (Doc. 210-1 at 13 (quoting Black's Law Dictionary)). BIC urges the Court to read the term "partner" in context: in the Policy, it appears eighteen times, always next to "member" or "manager," both of which are defined terms referring to corporate membership and management.

First, the "plain and ordinary meaning" of the word "partner" is not always so broad as Plaintiffs argue. Plaintiffs chose to highlight one definition provided by Merriam-Webster but failed to mention the next: "a member of a partnership especially in a business." Merriam-Webster Online, merriam-webster.com/dictionary/partner.[11] It does not take specialized legal or insurance knowledge to understand that the word "partner"

---

[10] "Manager" is defined as "a natural person serving in a directorial capacity for a limited liability company." (Doc. 149-2 at 19).

[11] Both definitions are also present in Black's Law Dictionary, as Plaintiffs point out in response to Defendants' brief. (Doc. 214-1 at 4).

may be referring to a partner in a business sense.

The Outside the Premises Insuring Agreement protects from loss of money or securities while "in the care and custody of a 'messenger' or an armored motor vehicle company." Plaintiffs rely on a Tenth Circuit case for the proposition that "messenger" is "not a legal term of art representing a special, recognized status such as the words 'agent' or 'bailee.'" *United Bank of Pueblo v. Hartford Acc. & Indem. Co.*, 529 F.2d 490, 494 (10th Cir. 1976). However, the policy at issue there protected from loss of property "in the custody of any of the Employees or partners of the Insured . . . or of any other person or persons acting as messenger." *Id.* "Messenger" was not defined in that policy, so the Court reasoned that "messenger"—placed after and separate from the specific categories or "employees" and "partners"—was meant to be a general term. Here, however, "messenger" is defined by the policy; there is no reason to impute the Tenth Circuit's analysis under the particular insurance policy at issue in *United Bank of Pueblo* to dictate that "messenger" must always be a broad, general term.

Moreover, "context matters." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 413-14 (2012). And Arizona courts "often interpret doubtful words by referring to accompanying words." *Goldberger v. State Farm Fire and Casualty Co.*, 448 P.3d 302, 305 (Ariz. Ct. App. 2019) (citing *Estate of Braden ex rel. Gabaldon v. State*, 266 P.3d 349, 352 (Ariz. 2011)). "Messenger" is defined as "you, your relative, or any of your partners or 'members', or any 'employee' while having care and custody of property outside the 'premises'." (Doc. 149-2 at 19). Each of those categories—other than "partner"—have specific, identifiable corporate connections with the insured that go beyond mere "association," as Plaintiffs argue should suffice. Reading "partner" in this context, common sense dictates a "partner" must also have a specific, identifiable connection with the insured. Additionally, the term "partners" is not found in isolation, but is situated within the clause, "any of your partners or 'members,'" suggesting a closeness in identity or meaning to "members." And a "member" is defined as "an owner of a limited liability company represented by its membership interest." (*Id.*). Under a common sense reading of

- 18 -

this provision, there is no reason to read "partner" as broadly as Plaintiffs' urge.

Plaintiffs also argue EAML, the entity which first purchased the Castle, was "part of the Jirehouse family of companies," rendering Jirehouse the "initial purchaser" which held title for nearly a month. (Doc. 152 at 10-11). Thus, Plaintiffs argue, Jirehouse had an ownership interest in the Castle and was Plaintiffs' "partner" in the transaction. But Plaintiffs' attempt to elide the corporate entities here does not render Jirehouse Plaintiffs' partner. There is a clear dispute about whether EAML is a Jirehouse affiliate. The Specific Engagement Letter states Jirehouse entered into an exclusivity agreement with the Castle's seller "on behalf of a special purpose vehicle employed on [Plaintiffs'] behalf as a front-facing buyer for the transaction, [EAML] and affiliated to this firm [sic] . . . ." (Doc. 149-4 at 3). Ultimately, whether EAML was affiliated with Jirehouse is immaterial. Even if Jirehouse were affiliated with EAML, Jirehouse itself had no stake in the Castle. Jirehouse shared no risk, and reaped no profit beyond legal fees, from the business venture of purchasing the Castle. (*See* BIC SOF at ¶¶ 67; Doc. 214-2 at ¶ 67). And nothing in the record suggests that EAML (or Jirehouse) made any profit from the temporary ownership of the Castle. The fact that Jirehouse facilitated the transaction through EAML as a special purpose vehicle, even if EAML is affiliated with Jirehouse, does not make Jirehouse Plaintiffs' partner in the transaction.

Finding that Jirehouse was Plaintiffs' partner in this transaction would be like saying a real estate agent is a partner in every house sale because she earns a commission. Indeed, reading "partner" within the definition of "messenger" to be as broad as Plaintiffs argue might render Barclays, where Jirehouse's general client account was located, a "partner" of Plaintiffs as well. Such a reading defies common sense. Mutual benefits certainly flow from business arrangements between two entities like this, where one hires another to help facilitate a transaction; but retaining Jirehouse for the project of purchasing the Castle does not make Jirehouse a "partner" in the purchase under the insurance policy.[12]

---

[12] Plaintiffs also point to the fact that Jirehouse's own insurer stated, "the extent to which the Jirehouse entities were in reality a solicitors' firm undertaking legal work or whether their principal business was that of capital finance/private equity is currently the subject of

Accordingly, BIC's Motion for Summary Judgment on this issue is granted; Plaintiffs' is denied.[13]

### c.  Whether the second loss is covered by the "Forgery or Alteration" Insuring Agreement (Section A.2)

Plaintiffs believe coverage exists for the fraudulent loan secured by the castle based on a provision regarding losses due to forgery. Section A.2 provides coverage for "loss resulting directly from 'forgery' or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in 'money'" that are (i) Made or drawn by or drawn upon you; or (ii) Made or drawn by one acting as your agent; Or that are purported to have been so made or drawn." (Doc. 149-2 at 7). The Policy defines "forgery" as "the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose." (Doc. 149-2 at 19).

The only document Plaintiffs assert was forged is the Loan Application; Plaintiffs do not assert any signature on the Dragonfly Charge or Dragonfly Facility was forged. (*See* BIC SOF ¶¶ 86-88). Rather, John Clark, a director of RTC, executed the Facility Agreement and the Charge that ultimately resulted in the loan and the security interest in the castle. (BIC SOF at ¶¶ 36, 38). Plaintiffs' Proof of Loss included an affidavit indicating Clark did not have the authority to sign these agreements. (Doc. 149-9 at 5). However, Plaintiffs make no additional arguments, nor do they offer additional facts, regarding the director Clark's role in securing the loan on behalf of RTC. Thus, the only document at issue here, under the Forgery provision, is the Loan Application.

---

ongoing investigation." (DLC SOF at ¶ 59). Plaintiffs argue this comment suggests Jirehouse was Plaintiffs' partner in the Castle purchase. However, this statement does not change the analysis of the language and applicability of the Primary Policy.

[13] Because the Court finds Jirehouse was not Plaintiffs' "partner," the Court need not address the parties' argument about whether the property was in Jirehouse's "care and custody" while situated in a Barclay's bank account. Additionally, because the Policy does not cover the loss under this insuring agreement, the Court need not reach whether Exclusion D.1.c (authorized representative exclusion) or Exclusion D.3.h (voluntarily parting with funds due to dishonest act exclusion) apply.

The first issue is whether the loan application was a "written promise" under this provision at all. BIC argues a loan application is not a "written promise" that is "similar" to checks, drafts, or promissory notes. (Doc. 210-1 at 17). The loan application is not a "promise" at all, BIC argues, because by definition it is a request for a loan rather than a guarantee to repay it. BIC further argues a loan application is not "similar to a check, draft, or promissory note" because those terms all refer to negotiable instruments; a loan application is not the same type of document, nor does it have the same legal or financial effect. (Doc. 210-1 at 17-18).

Plaintiffs urge the Court to look at the transaction as a whole, analyzing all of the documents together as a single instrument, rather than focusing on the one forged document at issue. (Doc. 214-1 at 10-11). Plaintiffs argue that under such analysis, the forged loan application together with the fraudulently submitted due diligence materials constituted a written promise to repay the Dragonfly Loan secured by the Castle, because without the forged loan application, the ultimate loan would not have issued. (Doc. 214-1 at 11). Plaintiffs principally rely on *Omnisource Corp. v. CAN/Transcon. Ins. Co.*, 949 F. Supp. 681 (N.D. Ind. 1996) for the proposition that the transaction's documents should be considered holistically. In that case, Omnisource submitted an application for a line of credit along with an agreement for an irrevocable letter of credit. *Id.* at 683. The application/agreement provided that the letter of credit would be available upon presentation of a sight draft (a negotiable instrument) accompanied by various supporting documents. *Id.* The sight draft was not forged, but the various supporting documents were. *Id.* The court in that case found that "construed together, these documents constitute a covered instrument" under a policy substantially similar to the one at issue here. *Id.* at 687.

 In *Omnisource*, however, the rationale for bundling the documents was that they had to be presented together for the bank to pay out on the line of credit; the sight draft would have been "useless without the supporting documents," which were forged. *Id.* at 688. Plaintiffs essentially argue Dragonfly would not have ultimately issued the loan without the original loan application, meaning the loan application must be considered

together with the later documentation. (Doc. 198 at 7-8). But in *Omnisource*, the documents had to be presented together in order to get the pay out on the line of credit; it was not a multi-step process, but multiple documents that were part of a single step. Here, by contrast, the loan application was submitted many months before the Dragonfly Facility agreement and Charge, and it had a different purpose and a different legal effect than the later documents. *Cf. Metro Fed. Credit Union v. Fed. Ins. Co.*, 607 F. Supp. 2d 870, 875 (N.D. Ill. 2009) (applying Illinois law to find that documents executed at different times, and for different—though related—purposes, should not be construed as a single instrument).

And "[b]y its own terms . . . the forgery endorsement only insures against losses from forgeries of written promises, orders, or directions to pay a sum certain that are 'similar,' meaning *of the same nature* as checks, drafts, promissory notes . . . namely, negotiable instruments made or drawn by [the insured]." *AIMS Ins. Program Managers Inc. v. Nat'l Fire Ins. Co. of Hartford*, No. 1 CA-CV-20-0032, 2021 WL 408874, at *3 (Ariz. Ct. App. Feb. 4, 2021). And it is clear that applications for credit are not negotiable instruments or documents with the same—or even similar—effect. The loan application was just that: an application, upon which no legal or financial obligations issued.[14]

And even if the Court were to assume the forged loan application was somehow covered by this policy, the loss Plaintiffs incurred did not result "directly" from the forgery as required by the policy. "'[D]irect' means 'direct.'" *Vons Cos., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492 (9th Cir. 2000).[15] Here, Plaintiffs allege only the signature on the application was forged; however, it is undisputed that John Clark, a director of RTC, executed the Facility Agreement and the Charge that ultimately resulted in the loan and the security interest in the castle. (BIC SOF at ¶¶ 36, 38). Thus, the loss did not result directly from the forged application. Rather, the forged application was submitted; RTC executed the loan

---

[14] Additionally, as Defendants argue, there was no "sum certain" identified in the loan application. (Doc. 210-1 at 20).

[15] The Policy further excluded "indirect loss," or "[l]oss that is an indirect result of an 'occurrence' covered by this Policy." (Doc. 149-2 at 9).

Facility and Charge months later; Dragonfly disbursed nearly 5 million pounds to RTC under the Loan Facility Agreement to an account owned by Jirehouse, and Jones allegedly transferred the money for his own use; RTC defaulted on its payments, and Dragonfly demanded immediate repayment. Only at that point did Plaintiffs incur a "loss" when RTC entered into the Dragonfly Settlement, under which RTC agreed to pay nearly 5 million pounds to release the Dragonfly Charge, and for which Plaintiffs apparently footed the bill. Thus, even if Plaintiffs DLE and DLC ultimately incurred a loss from paying out the Dragonfly Settlement on behalf of RTC, as they contend, that loss cannot be said to have "directly" resulted from the forged loan application itself.[16] *Cf. Sperling & Slater, P.C. v. Hartford Cas. Ins. Co.*, 2012 WL 6720611, at *4 (N.D. Ill. Dec. 27, 2012) (collecting cases); *id.* ("Courts have repeatedly held that employee dishonesty provisions do not cover losses suffered by a third-party that the insured subsequently reimburses because they are not direct losses. Rather, they are subsequent liabilities incurred by the insured.").

Accordingly, Plaintiffs' motion for summary judgment on this issue is denied. BIC's motion for summary judgment will be granted.

### 2. GAIC's Motion for Summary Judgment

GAIC argues it is entitled to summary judgment based on various arguments the Court need not reach. GAIC's Excess Policy provides coverage for loss which "would have been paid under the [underlying policy] but for the fact that such loss exceeds the limit of liability of the Underlying Carrier(s)" and "for which the Underlying Carrier(s) has (have) made payment, and the Insured has collected, the full amount of the expressed limit of the Underlying Carrier's(s) liability." (Doc. 209-4 at 4). Because the Court finds there was no coverage under the primary policy issued by BIC, there is no coverage on the excess policy. (*See* Doc. 209-1 at 7). Accordingly, GAIC's motion for summary judgment will be granted for all claims against it.

//

---

[16] BIC argues Exclusion D.1.c (authorized representative exclusion) would preclude coverage for the second loss as well. (Doc. 210-1 at 16 n.11). But because the Policy does not cover the loss in the first place, the court will not address this argument.

**3.   Whether Plaintiffs Made any Fraudulent Misrepresentations Adding TCD as a Joint Insured**

Plaintiffs move for summary judgment on BIC's Sixteenth, Seventeenth, and Eighteenth Affirmative Defenses and Counterclaims I and II, and GAIC's Fifth Affirmative Defense and Counterclaims I and II. All these claims and defenses concern the putative rescission of the amendment adding TCD and DeJoria Trust as insureds after Plaintiffs learned of the losses. They are governed by common law and Ariz. Rev. Stat. § 20-1109; under that statute, an insurer cannot refuse to provide coverage for a loss under a policy because of a misrepresentation, omission, concealment of facts, or incorrect statement in the application for the insurance policy unless "(1) the misrepresentation is fraudulent; (2) the misrepresentation is 'material either to the acceptance of the risk, or to the hazard assumed by the insurer,' and (3) the 'insurer in good faith would . . . not have issued the policy . . . if the true facts had been made known to the insurer as required either by the application or the policy or otherwise.'" *James River Ins. Co.*, 523 F.3d at 920-21 (quoting Ariz. Rev. Stat. § 20-1109).

Because the Court finds no coverage under the plain language of the Policy, it is unclear whether the Defendants' counterclaims require resolution. If the putative rescission is somehow relevant regarding other losses, the effectiveness of the rescission may be best litigated in the context of those losses. The parties will be required to file a joint statement setting forth whether those counterclaims remain pending. Accordingly, Plaintiffs' motion for summary judgment on this issue will be denied without prejudice.

**4.   Plaintiffs' Bad Faith Claims**

Lastly, BIC moves for summary judgment on Plaintiffs' bad faith claims. "An insurance contract is not an ordinary commercial bargain; 'implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (2000) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 570 (1986)). "Although an insurer may challenge a claim for which coverage is 'fairly debatable,' it commits the tort of insurance bad faith when it 'intentionally denies, fails to

process or pay a claim without a reasonable basis.'" *Fidelity Nat'l Title Ins. Co. v. Osborn III Partners LLC*, 483 P.237, 250 (Ariz. Ct. App. 2021) (quoting *Zillisch*, 995 P.2d at 279). An insurer may breach the duty of good faith "even if the policy does not provide coverage." *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 943 P.2d 729, 737 (Ariz. Ct. App. 1996). To prevail on a claim of bad faith, the insured must show (1) in "the investigation, evaluation, and processing of the claim, the insurer acted unreasonably," and (2) the insurer "either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch*, 995 P.2d at 280. *See also Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1004 (D. Ariz. 2013) (quoting *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719. 723 (Ariz. 1990)) ("Arizona employs a two-pronged test that has an objective and subjective component. First is the objective inquiry: did the insurer act unreasonably toward the insured? . . . Second is the subjective: did the insurer act 'knowingly or with reckless disregard as to the reasonableness of its actions?'"). Arizona's two-prong test applies to "both the insurer's evaluation of the claim and the insurer's claims handling process." *Temple v. Hartford Ins. Co. of Midwest*, 40 F. Supp. 3d 1156, 1165 (D. Ariz. 2014). Examples of unreasonable actions include failure to "immediately conduct an adequate investigation," failure to "act promptly in paying a legitimate claim," and "lowballing claims." *Demetrulias*, 917 F. Supp. 2d at 1104 (quoting *Zilisch*, 995 P.2d at 276).

Plaintiffs argue BIC acted in bad faith both by failing to complete an adequate investigation and by unreasonably delaying investigations into their claims. BIC, on the other hand, argues that in Arizona, "[a]n insurance company's failure to adequately investigate only becomes material [to a bad faith claim] when a further investigation would have disclosed relevant facts," but that no new facts relevant to Plaintiffs' claims were raised through the extensive discovery in this matter, meaning their investigation was reasonable and adequate. (Doc. 210-1 at 23) (quoting *Carlson v. Independent Order of the Foresters*, 2017 WL 957283, at *7 (D. Ariz. Mar. 13, 2017)).

The first question is whether BIC objectively acted unreasonably by failing to conduct an adequate investigation. *Zilisch*, 995 P.2d at 280. Plaintiffs' arguments on this

issue primarily concern BIC's decision to hire an attorney investigator, Mr. Oliva, to investigate the claims. Plaintiffs argue BIC hired Mr. Oliva because he had previously helped BIC out of a coverage dispute. (Doc. 214-1 at 22). Plaintiffs argue BIC adjusters did not review their documents at all, but relied on the coverage analysis produced by Mr. Oliva. (Doc. 214-1 at 22).[17] However, Plaintiffs cite no case law supporting the assertion that an insurer acts in bad faith by hiring an external investigator to help assess claims.[18] The investigation was thorough, the investigator reviewed thousands of pages of Plaintiffs' documents, and Plaintiffs point to no evidence that BIC failed to conduct an adequate investigation. (Doc. 214-2 at ¶ 78). On the contrary, it appears BIC relied on the same material facts that are relevant in this litigation in reaching its coverage decision. *See Aetna Cas. And Sur. Co. v. Superior Court In and For Cnty. of Maricopa*, 778 P.2d 1333, 1336 (Ariz. Ct. App. 1989) (citing *Pace v. Ins. Co. of N. Am.*, 838 F.2d 572, 584 (1st Cir. 1988)) ("An insurance company's failure to adequately investigate only becomes material when a further investigation would have disclosed relevant facts."). BIC did not fail to adequately investigate Plaintiffs' claims.

The second question is whether BIC objectively and unreasonably delayed its investigation of Plaintiffs' claims. BIC argues they came to a decision within ten months of receiving the Proofs of Loss, but does not otherwise respond to Plaintiffs' arguments about delaying the investigation. (Doc. 195 at 10). Plaintiffs, on the other hand, argue they

---

[17] Plaintiffs also point to an error in the declination letter: the letter states that Plaintiff's asserted Jones (not Jirehouse) was Plaintiffs' partner, even though Plaintiffs never took that position. However, one isolated error does not support the argument that the entire declination or investigation was conducted in objectively unreasonable bad faith.

[18] Additionally, while Plaintiffs argue BIC's choice of Mr. Oliva was strategically designed to help them avoid coverage based on his past experience, the record does not as a matter of law support that contention. The record shows that BIC hired Mr. Oliva because he was "a national attorney" who "handles claims across the country" who has "fidelity expertise," and that BIC was familiar with his work from successfully defeating a motion to dismiss with his help after denying coverage on a claim in Virginia. (Doc. 214-19 at 24). The fact that BIC retained Mr. Oliva in part because he had previously helped them in a situation where they denied coverage does not necessarily suggest BIC was objectively unreasonable in hiring him to assess Plaintiffs' claims.

notified BIC of the loss on March 18, 2019, and provided two detailed Proofs of Loss on July 30, 2019, but that no one reviewed them until August 19, 2019. (Doc. 185 at 22). Plaintiffs claim the delay was because BIC had to hire an attorney investigator, Mr. Oliva, to look into the claim because they lacked the resources to do so themselves, and that the delay violated BIC's own internal standards and A.A.C. R20-6-801 (which requires investigation within 30 days after notification of claim, unless investigation cannot reasonably be completed in that time).[19] On December 20, 2019, Plaintiffs asked BIC to execute a nondisclosure agreement before producing documents for their review, and they argue BIC delayed in executing the agreement such that the production of documents could not happen until February 13, 2020. (Doc. 214-1 at 22). In March of 2020, Plaintiffs and Defendants met virtually, and Plaintiffs contend that Defendants only asked "limited" questions and did not discuss coverage of Plaintiffs' claims during the meeting. BIC then denied Plaintiffs' claims on May 21, 2020. (BIC SOF at ¶ 80).

Plaintiffs did provide a "notice" of loss in March 2019, but provided no details until July 30, 2019, when they submitted their Proofs of Loss. (Docs. 210-11 and 210-12). Additionally, they submitted these claims one day after retroactively adding Plaintiff TCD as a "joint insured" under the policies. (DLC SOF at ¶¶ 24, 25, 27). Any delay between March and the end of July is squarely not attributable to BIC. *Cf. Demetrulias*, 917 F. Supp. 2d at 1005 (where insurer did not have the information, because doctor faxed information to the wrong office, insurer was not liable for bad faith because of a delay). Plaintiffs complain about the three weeks that passed after the proofs of loss before BIC reviewed their claims, but taking three weeks to preliminarily assess complex, multimillion dollar claims is not objectively unreasonable. (*See* Doc. 214-20 at 9 (in response to question about what was happening between July 30 and August 19, 2019, BIC adjuster Ms. Gurka

---

[19] BIC argues the Arizona Administrative Code cited by Plaintiffs to establish an unreasonable delay is inapplicable, because "[t]he provisions are expressly not a standard of conduct against which an insurer's conduct in handling an individual claim is to be measured for creating a claim for relief." *Melancon v. USAA Ca. Inc. Co.*, 174 Ariz. 344, 347 (Ariz. 1992).

explained, "I was performing a coverage analysis. I was continuing to investigate coverage. There was a lot of material submitted. It was quite dense material so I was synthesizing it and analyzing it.").[20] On August 28, 2019, Ms. Gurka alerted Plaintiffs that BIC had hired an attorney investigator because of the possible travel involved in investigating the claims, and that they are "working toward completing our investigation as quickly as possible." (Doc. 214-20 at 11). Neither Plaintiffs nor Defendants explain what happened during September and October. On October 21, 2019, Mr. Oliva reached out to Plaintiffs and explained that he had been hired to investigate the claims because BIC did not have time to "look at them in depth." (Doc. 72-3 at 14). Accordingly, the parties have pointed to no evidence to suggest any delay in beginning the investigation was unreasonable; rather, the evidence suggests BIC was working to assess these claims and to promptly hire an investigator. *Compare Zilisch*, 995 P.2d at 280-81 (finding bad faith for delay where insurer insisted on seeing a non-existent report as a "pretext to drag out the claims process" and did not evaluate a claim for ten months after receiving the demand despite having all of the records available).

Plaintiffs also allege BIC unreasonably delayed the investigation by not promptly signing a nondisclosure agreement they requested. On November 20, 2019, Mr. Oliva sent a detailed request for documents from Plaintiffs to aid his investigation. (Doc. 72-3 at 22-25). At this point, Plaintiffs provided some but not all of the requested information, and on December 20, 2019, Plaintiffs sent a proposed nondisclosure agreement to Mr. Oliva. (Docs. 181-12, 181-13). It appears there may have been a slight delay based on a typographical error Plaintiffs made in Mr. Oliva's email address when sending him the nondisclosure agreement. (*See* Doc. 72-3 at 42 (January 15, 2020 email from Mr. Oliva acknowledging receipt, identifying spelling error, and sending agreement back to Plaintiffs with proposed edits)). Plaintiffs then responded to Mr. Oliva's suggested edits on January 20, 2020. (Doc. 72-3 at 36-37). Mr. Oliva executed the NDA by February 3, 2020. (Doc.

---

[20] Ms. Gurka also explained she was unable to open the virtually submitted document son July 31st, when she received them, because they were password protected, so she had to wait for the hard copy documents to arrive to review them. (Doc. 214-20 at 10).

72-3 at 36). On February 13, 2020, Plaintiffs sent the remaining information and documents to Mr. Oliva. (Doc. 181-15). There is no evidence suggesting either BIC or Mr. Oliva was purposefully or unreasonably delaying signing the nondisclosure agreement. Indeed, there were back and forth edits to the agreement, and the dates show constant forward progress on negotiating and executing the agreement that was first requested on December 20, 2019 and executed by February 2, 2020. Additionally, Plaintiffs requested the nondisclosure agreement and were responsible for at least part of the delays (e.g., not sending the nondisclosure agreement until a month after Mr. Oliva's request for documents, the typographical error made when sending it to him, and the ten days that passed after Mr. Oliva executed the document).

Plaintiffs lastly complain they did not have a meeting with BIC until March, "nearly a year after [they] submitted their first notice of the losses." (Doc. 214-1 at 22).[21] Neither Plaintiffs nor Defendants specifically explain what happened to this investigation after that meeting in March, April, and May 2020, but BIC's denial letter was sent on May 21, 2020. (BIC SOF at ¶ 80; Doc. 210-28).[22] Plaintiffs have not pointed to any evidence suggesting this final delay was objectively unreasonable.

Moreover, even if BIC was objectively unreasonable in its investigation (either in its adequacy or its timing), Plaintiffs fail to provide any admissible evidence demonstrating BIC's subjective knowledge or disregard for any unreasonable behavior. *See Montoya Lopez v. Allstate Ins. Co.*, 282 F. Supp. 2d 1095, 1101 (D. Ariz. 2003) (finding, in addition to no objective evidence of unreasonable delay, no evidence of subjective unreasonableness). Because BIC moves for summary judgment on this issue, the Court draws all inferences in favor of Plaintiffs; however, Plaintiffs cannot survive summary judgment based on speculation alone. *See Centeno v. Am. Liberty Ins. Co.*, 2019 WL

---

[21] Meanwhile, however, Mr. Oliva had asked Plaintiffs to find a date to meet as early as January 30, 2020, before the nondisclosure agreement had been signed, and on February 12, had to ask Plaintiffs again to confirm a meeting date of March 9, which Plaintiffs confirmed on February 14. (Doc. 72-3 at 32-36).

[22] March, April, and May 2020 were unusual times and some delay in processing insurance claims during that time is not surprising.

4849548, at *6 (D. Ariz. Oct. 1, 2019) (granting defendant's motion for summary judgment because plaintiff's "speculative and conclusory evidence . . . lacks the probative value to raise a genuine issue of material fact regarding [defendant's] intent").  *See also Hill v. Walmart Inc.*, 32 F.4th 811, 818 (9th Cir. 2022) (holding, under California law, that because "[plaintiff's] argument amounts to mere speculation that [defendant] was acting in bad faith," it was "insufficient to defeat summary judgment"). *Compare Martin v. Great Lakes Reinsurance (U.K.), P.L.C.*, 2010 WL 94120, at *5 (D. Ariz. Jan. 6, 2010) (denying summary judgment because plaintiff presented evidence that defendant consciously disregarded a reputable estimate and threatened to withdraw an unreasonably low offer of settlement if not accepted within seven days).[23] BIC's motion for summary judgment on bad faith will be granted.

## CONCLUSION

Plaintiffs' two losses are not covered under the plain and ordinary reading of the relevant sections of the Primary Policy. Thus, Plaintiffs' Motion for Partial Summary Judgment will be denied, and BIC's and GAIC's motions will be granted as to all of Plaintiffs' claims. The parties are to file a Joint Statement indicating whether Defendants' counterclaims are still pending in light of this ruling.

Accordingly,

**IT IS ORDERED** Plaintiffs' Motion for Partial Summary Judgment (Doc. 151) is **DENIED**.

---

[23] BIC also argues that Plaintiffs suffered no damages from any allegedly unreasonable investigation, essentially barring this claim. Indeed, "an element of bad faith, like any other tort, is causation and damages." *Demetrulias*, 917 F. Supp. 2d at 1010. Plaintiffs vigorously contend they suffered damages from BIC's delay, but they have provided no admissible evidence to support that claim. Plaintiffs' statement of facts asserts that they "suffered economic, consequential, and general damages" as "a direct and proximate result of BIC's bad faith," and that they have "not received the benefits of the Primary Policies and have been forced to incur costs and expend resources to pursue recovery." (Doc. 214-2 at ¶ 89). However, their only citation to support their assertion of damages is their own amended complaint. (*Id.*). Additionally, it is unclear what damages Plaintiffs contend resulted from the alleged bad faith delay in assessing their claims, rather than simply from the ultimate denial of coverage.

1       **IT IS FURTHER ORDERED** Defendant BIC's Motion for Partial Summary

2   Judgment (Doc. 145) is **GRANTED**.

3       **IT IS FURTHER ORDERED** Defendant GAIC's Motion for Summary Judgment

4   (Doc. 147) is **GRANTED**.

5       **IT IS FURTHER ORDERED** within 14 days from this Order, the Parties shall file

6   either a Joint Statement or Separate Statements addressing whether Defendants' rescission

7   counterclaims are still pending.

8       Dated this 14th day of March, 2023.

 

 

 

                        Honorable Roslyn O. Silver
                        Senior United States District Judge